# IN THE COURT OF APPEALS OF TENNESSEE
## AT KNOXVILLE
Assigned on Briefs October 4, 2011

## IN RE KEARA J. ET AL.

### Appeal from the Juvenile Court for Knox County
### No. 114975    Timothy E. Irwin, Judge

_____

### No. E2011-00850-COA-R3-PT-FILED-JANUARY 13, 2012

_____

This is a termination of parental rights case involving siblings, Keara J. and Sierra J. (collectively "the Children"), the minor daughters of Christie J. ("Mother") and Kenneth J. ("Father"). The Department of Children's Services ("DCS") received a referral from Keara's pediatrician concerning her persistent lack of growth and development; at some 16 months old, she weighed only 19 lb., and was unable to walk, stand, or speak. DCS immediately removed Keara from her parents' custody and filed a petition to terminate both parents' rights, alleging that Keara was severely abused as a result of her parents' neglect. Because of the severe abuse of Keara, she and her later-born sister, Sierra, were placed in separate foster homes. After a bench trial, the court granted the petition and terminated both parents' rights to the Children. Mother and Father appeal. We affirm.

### Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court Affirmed; Case Remanded

CHARLES D. SUSANO, JR., J., delivered the opinion of the Court, in which D. MICHAEL SWINEY and JOHN W. MCCLARTY, JJ., joined.

Jennifer S. Bjornstad, Knoxville, Tennessee (at trial); Gregory E. Bennett, Seymour, Tennessee (on appeal), for the appellant, Christie J.

Mandy Hancock, Knoxville, Tennessee (at trial); Ben H. Houston, II, Knoxville, Tennessee (on appeal), for the appellant, Kenneth J.

Robert E. Cooper, Jr., Attorney General and Reporter; David Hull, Assistant General Counsel, Department of Children's Services, Knoxville, Tennessee (at trial); and Stephanie R. Reevers, Senior Counsel, Office of the Attorney General, Nashville, Tennessee (on appeal), for the appellee, Department of Children's Services.

Sherry Mahar, Knoxville, Tennessee, Guardian Ad Litem.

**OPINION**

I.

Trial on the petition to terminate was held over three days between August 2010 and March 2011. The proof showed that Mother and Father lived together for several years before Mother became pregnant with Keara. Mother and Father were married in January 2010. That same month, Keara, at 17 months, was removed from their custody. The following month, Mother gave birth to the parties' second child, Sierra. As a result of the alleged abuse of Keara, Sierra was immediately taken into DCS custody; she followed her sister into foster care.

At the time of trial, both Mother and Father were facing criminal charges of child neglect with respect to Keara. As a result, they refused to answer any questions regarding their care prior to Keara's removal. Mother, 37, conceded that she was HIV positive and that she had previously lived in Florida, where she was convicted of prostitution while carrying the disease. She served several years in prison. In 2003, Mother had her first child, a daughter, who was removed from her custody at ten days of age and later adopted. Mother stated that she was using drugs and associating with the "wrong people" at the time. Mother denied that, before moving to Tennessee, she had a second child who she left behind in the care of an unnamed friend despite the fact that she had reported this information to a DCS investigator and on her prenatal hospital form.

In addition to having HIV, Mother nearly died in 2009 as a result of complications from pneumonia; was quarantined with tuberculosis in 2010; and took prescription medication for depression. Mother was deemed disabled as a result of the HIV condition and was receiving disability benefits. Father, 42, worked as a cook and sold insurance. Since the Children's removal, he has completed many of the obligations required by the permanency plans developed by DCS, including attendance at doctors' appointments, maintaining regular visitation and paying child support. However, Father never completed a parenting assessment or parenting classes. Father denied being hostile to the receipt of parenting advice from his DCS case manager. According to Mother, she and Father had maintained a clean, two-bedroom apartment for the past several years; she claimed that they had a good relationship with the Children. They wanted custody returned, but, if this was not possible, they felt the Children should be placed together.

Dr. Martha Sparrow oversaw the pediatric practice at Children's Primary Care Center where Keara had been seen since birth. At trial, Dr. Sparrow reviewed in detail Keara's

appointments and patient history with the various providers at the Center. As reported by the doctor, Keara was born on September 12, 2008, a full-term, healthy baby, who weighed 7 lb., 15 oz. – within the 50-60th percentile weight range for a newborn. Mother brought Keara to her first doctor's visit at four days old and reported she was taking formula every three hours. No concerns were noted. Both parents accompanied Keara to her next visit, where it was noted that, at 17 days, Keara had not yet regained her birth weight and was then in the 40-45% range. Mother indicated that she had been mixing Keara's formula in a less concentrated state than directed. Both parents were instructed regarding proper formula preparation and feeding frequency for an infant.

On October 3, 2008, Keara returned to the Center. At three weeks, she weighed 8 lb., 7 oz., within the 37% weight range, while her height was in the 50% range and her head circumference was in the 25% range. Both Mother and Father attended Keara's next check-up. On this occasion, her general health was found to be "normal," but her weight and head measurement were both in the 25% range. Mother and Father returned with Keara on January 13, 2009, for her scheduled four-month visit. She weighed nearly 12 pounds, placing her in the 10-25% weight range. She showed no ability to roll over. At this point, her pediatrician noted that Keara's lack of growth was "something to watch" and Mother and Father were again instructed on proper nutrition and further advised to begin feeding the baby solid baby foods.

Father by himself brought Keara to her six-month check-up in March 2009. The child's doctor noted that Keara was "happy" and "laughed easily." At the same time, the doctor described Keara as appearing thin; her ribs were visible, she had minimal fat rolls, and had shown an "alarming" four-standard deviation in her weight range since birth. Keara's head circumference was in the 5-10% range and she had "fallen off the growth chart for weight." Further, she had failed to reach certain developmental milestones – she was unable to make "babbling" sounds or focus on someone's face, could not purposefully roll over, did not reach out to explore objects, and could not sit unassisted even for brief periods. Father and Mother requested that Keara be tested for HIV; the results showed that she had "positive antibodies," indicating she had been exposed to HIV; she had not yet developed the disease. Dr. Sparrow noted that the major concern was Keara's weight. Dr. Sparrow concluded that Father's report of Keara's food intake was not commensurate with her lack of growth. Father reported a concern that the amount of formula Keara drank left her unable to gain weight. He was instructed to keep a "food diary" to assist her doctors, to discontinue juice, to "absolutely" feed her solid foods, and to report back two weeks later, in early April, because her doctors did not want to wait until the next regular check-up to further address the problems they saw.

Father and Mother did not return with Keara until three and a half months later, on June 24, 2009. Keara was then nine months old and weighed just over 15 pounds, "still off of the growth chart, below the third percentile," while her head circumference had returned to the 25% range. At this visit, her treating physician focused on Keara's lower extremities and neurological exam; her legs were very thin and could not bear weight for more than a few seconds. She could not crawl or sit steadily and was unusually quiet. Although Mother and Father reported she was able to say a few words, play games and reach for objects, the examining doctor was unable to elicit any of these actions. Mother and Father did not bring a food diary for her doctors to review despite being told to do so. Keara was referred to a nutritionist and diagnosed as "fail[ing] to thrive and developmentally delayed with no question, especially gross motor delay." She was also referred to a physiatrist and for physical therapy.

Mother and Father returned with Keara in October 2009. At 12 ½ months, she was unable to stand and continued to show general weakness and obvious gross motor delays. She weighed 17 pounds, 10 oz., still at the 3% weight range, while her height was at the 50% range and her head circumference remained at 25%. Since her last visit, Keara had had an initial visit with the nutritionist, who instructed that she be seen again in six weeks. The parents failed to return as instructed. The nutritionist noted that, according to Father, "mother found it easier to give bottles, so that is what [Keara] gets mostly," despite her doctor's earlier advice to both parents that "she could not exist on fluids alone." Mother and Father mentioned a variety of foods they said Keara ate, but Mother also stated that the child continued to consume some six bottles of milk and juice a day. Keara had not been taken to see Dr. Trainer, the physiatrist to whom she was referred for her developmental delays. She had an initial evaluation with a physical therapist, but Mother and Father complained that Keara was treated "unfairly and roughly" and decided not to continue therapy. Mother and Father were instructed to stop bottle-feeding and to push the child to eat solid foods. They were further instructed to return the next month and again referred to the nutritionist and to Dr. Trainer for an evaluation, occupational therapy for improved feeding, and physical therapy.

When Keara failed to return for her 16-month visit on January 20, 2010, as instructed, Dr. Sparrow's office contacted Mother and Father and rescheduled the visit for eight days later; Dr. Sparrow explained that they initiated contact because Keara's doctors were concerned that the Child had missed an important check-up and because they were aware that she was discharged by Dr. Trainer for failing to keep physical therapy appointments and missing her evaluation. Dr. Sparrow stressed that early intervention regarding developmental delays had been shown to be effective; she also stated that the harm caused from a lack of nutrition could be irreversible.

-4-

Mother and Father returned with Keara on January 28, 2010. At 16 ½ months, she weighed 19 lb., 6 oz. Her head circumference had dropped back to the 10th percentile. Dr. Sparrow found her head measurement to be "alarming"– the doctor explained that periods of malnutrition or lack of care can result in some loss in weight and height,

> but for there to be loss in the head circumference means that there's not been brain growth, and worse than that, potentially brain damage, that at that point, if there's not an intervention, then that becomes a medical disaster in no uncertain terms.

Keara's chart indicates that her parents had discontinued her physical therapy because "[the therapist] made the baby cry." Father reported that she could say three to six words, but the doctor was not able to elicit any words or sounds during the visit. Further, Mother reported that Keara could crawl, but added that "she gets into everything if she takes her out of the playpen and can't have that." Her doctor observed that Keara was "not really crawling," but scooting her upper body without using her legs. If she was picked up, her legs remained drawn up in the fetal position. Muscular atrophy of both legs was noted. The parents reported that Keara was a "picky eater," and that she consumed five bottles of milk and three bottles of juice a day. Her treating physician noted that she stayed in her stroller drinking a bottle throughout the visit.

During the January 28, 2010, visit, Dr. Sparrow observed Keara over several hours and found that, unlike most 16-month-olds, she was eager for social interaction. Contrary to the food intake reported by her parents, Dr. Sparrow saw nothing to indicate that Keara knew how to do anything but take a bottle. Dr. Sparrow was familiar with Keara's case, but others in the group had treated her. Dr. Sparrow was "shocked, appalled and distressed by the sight of this [C]hild." It was noted that the child had no visible motor development from the waist down and scooted around on her bottom with her legs crossed underneath. Her doctors decided to keep Keara at their offices until they could call Child Protective Services to request emergency intervention.

DCS investigator Vickie Fox arrived and questioned Mother and Father. Asked why Keara was not taken to the referred specialists, Mother cited lack of transportation. Fox was aware that Mother and Father had had four prior DCS cases, but Mother reported only one when questioned. Fox observed that Keara was quiet and remained in her stroller the whole time; she also noticed her thin legs. When asked about Keara being kept in a playpen too long, Fox said that Father "sort of looked at [Mother] and said I told you you should have taken her out more." Mother and Father were questioned about Keara's eating habits and reported that she would only eat a couple bites of food and then they would give her a bottle.

After DCS took custody of the child, the nursing staff prepared some food for Keara. Fox observed her eat "an entire container of macaroni and cheese, a couple of packages of crackers, and an entire bottle of Ensure." In fact, she refused nothing that was offered. DCS's investigation concluded that both Mother and Father were responsible for "nutritional negligen[ce] and medical maltreatment" of Keara.

Six weeks after her removal, Keara had improved from 3% to 20% on the growth chart and from 10% to 37-40% in head circumference. Dr. Sparrow felt the head growth, in particular, was "pretty miraculous" and that it came in response to many things, but especially proper nutrition. At the time of trial, Keara had a demonstrated bond with her foster parent and his partner; had seen all the specialists to whom she had been referred; and had made "huge strides" in all areas. Dr. Sparrow concluded that if Keara had had an underlying, pathological problem, it could not have been substantially "erased" in such a short period. She opined that the dramatic, positive growth and other gains indicated that the Child was essentially "malnourished and . . . totally neglected" by Mother and Father.

Dr. Miriam Weinstein, a physiatrist, first saw Keara after she entered foster care. Her evaluation led her to conclude that Keara had a "large weakness" that was probably due to being kept in an infant seat. She called for a neurological evaluation to be sure there was no other, underlying problem, but was reasonably certain that Keara's developmental delays were due to "disuse"– that is, she was not given the chance or allowed to use her legs to stand. She prescribed weekly physical and occupational therapy and at-home exercises. Keara "responded beautifully" to this regimen. By July 2010, the child was walking with braces that helped stabilize her feet and ankles, and could squat and rise with good balance. Dr. Weinstein also observed Keara's psychological progress – she had gone from clinging to her foster parent and being fearful to easily separating from him, exploring the room and interacting comfortably with others. Dr. Weinstein opined that Keara's earlier deficits were caused by severe neglect.

Gwendolyn Brown, Keara's foster care case manager, supervised Keara's visits with Mother and Father. In summarizing her observations, she believed that "the parents lack the mental and emotional capacity to understand and provide basic medical, nutritional, developmental care for the kids."

At the conclusion of trial, the court terminated both parents' rights to the Children based on its finding, by clear and convincing evidence, that Keara was subjected to multiple forms of severe child abuse pursuant to Tenn. Code Ann. § 36-1-113(g)(4) (2010). More specifically, as to Mother, the court found that she knowingly exposed or failed to protect Keara from abuse or neglect likely to cause great bodily harm or death by failing to report her HIV infection so that preventive measures could be administered to protect Keara from

the disease. As to both Mother and Father, the court found that they severely abused Keara (1) by knowingly failing to protect her from neglect likely to cause serious bodily injury or death, and (2) through specific incidences of neglect that caused or were likely to cause her severe developmental delay and severe impairment of her ability to function adequately in her environment.

In summary, as to both parents, the court observed:

> I also think that the failure to give [Keara] the food [she] needed to eat and the love and the freedom of movement, and the help [she] needed to stand and move and walk and crawl and talk. I mean, this child was sixteen months old and couldn't stand. Not walk, stand. Couldn't crawl, couldn't talk. And now look at her. They appear to be worried about it, they knew something was wrong, but the reason something was wrong [was] because they couldn't, they either weren't able or wouldn't do, what they needed to do as parents.

Mother and Father, represented by separate counsel, each timely filed a notice of appeal and each filed a separate brief for our review.

## II.

There are six issues before us. Mother presents the following issues:

> 1. Did the trial court err in finding, by clear and convincing evidence, that Mother subjected the Child, Keara, to severe child abuse?
>
> 2. Did the trial court err in finding that termination of Mother's parental rights was in the best interest of the Children?

Father presents four additional issues that we restate as follows:

> 3. Did the trial court err in finding, by clear and convincing evidence, that Father subjected the Child, Keara, to severe child abuse?

4. Did the trial court err in relying on the purported expert testimony of two doctors to support its finding of severe child abuse?

5. Did the trial court err in granting the petition to terminate Father's rights that DCS filed shortly after entering into a permanency plan with a stated goal of parental reunification?

6. Did the trial court err in finding, by clear and convincing evidence, that termination of Father's rights was in the best interest of the Children?

III.

We utilize the following standard of review in cases alleging a basis for terminating parental rights:

> [T]his Court's duty. . . is to determine whether the trial court's findings, made under a clear and convincing standard, are supported by a preponderance of the evidence.

*In re F.R.R., III*, 193 S.W.3d 528, 530 (Tenn. 2006). The trial court's findings of fact are reviewed de novo upon the record accompanied by a presumption of correctness unless the preponderance of the evidence is against those findings. *Id*.; Tenn. R. App. P. 13(d). In weighing the preponderance of the evidence, great weight is accorded to the trial court's determinations of witness credibility, which will not be disturbed absent clear and convincing evidence to the contrary. *See Jones v. Garrett*, 92 S.W.3d 835, 838 (Tenn. 2002). Questions of law are reviewed de novo with no presumption of correctness. *Langschmidt v. Langschmidt*, 81 S.W.3d 741, 744-45 (Tenn. 2002).

It is well established that parents have a fundamental right to the care, custody, and control of their children. *Stanley v. Illinois*, 405 U.S. 645, 92 S.Ct. 1208, 31 L.Ed.2d 551 (1972); *In re Drinnon*, 776 S.W.2d 96, 97 (Tenn. Ct. App. 1988). While parental rights are superior to the claims of other persons and the government, they are not absolute, and they may be terminated upon appropriate statutory grounds. *See Blair v. Badenhope*, 77 S.W.3d 137, 141 (Tenn. 2002). A parent's rights may be terminated upon "(1) [a] finding by the court by clear and convincing evidence that the grounds for termination of parental or guardianship rights have been established; and (2) [t]hat termination of the parent's or guardian's rights is in the best interests of the child." T.C.A. § 36-1-113(c); *In re F.R.R., III*, 193 S.W.3d at 530. Both of these elements must be established by clear and convincing evidence. *See*

T.C.A. § 36-1-113(c)(1); *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002). Evidence satisfying the clear and convincing evidence standard establishes that the truth of the facts asserted is highly probable, *State v. Demarr*, No. M2002-02603-COA-R3-JV, 2003 WL 21946726, at *9 (Tenn. Ct. App. M.S., filed August 13, 2003), and eliminates any serious or substantial doubt about the correctness of the conclusions drawn from the evidence. *In re Valentine*, 79 S.W.3d at 546; *In re S.M.*, 149 S.W.3d 632, 639 (Tenn. Ct. App. 2004).

IV.

Mother first challenges the trial court's finding that she subjected Keara to severe abuse by failing to disclose her HIV status to medical providers. On this issue, the court found that

> [Mother] . . . did knowingly expose this child to a substantial risk of great bodily harm or death by means of her willful and knowing failure to disclose her HIV (+) positive status in the course of her prenatal care, which failure caused . . . the child to be unnecessarily exposed to the HIV disease, a disease . . . [Mother] was told placed the child's very life in danger.

Tenn. Code Ann. § 37-1-102(b)(23)(A) (2010) defines "severe child abuse" to include "[t]he knowing exposure of a child to or the knowing failure to protect a child from abuse or neglect that is likely to cause great bodily harm or death . . . ." In its bench ruling, the trial court elaborated on its finding of this ground as follows:

> First, the HIV infection. Here we have a mother that actually does jail time for continuing to work in Florida as a prostitute, and while knowing she had an HIV infection. She comes to Knox County and fails to report her infection to her OB/GYN . . . , High-risk pregnancy doctor. Does that come under a definition of severe child abuse? "The knowing exposure of a child to or the knowing failure to protect a child from abuse or neglect that is likely to cause great bodily harm or death, . . . ."
>
> Does not telling your doctor that you have HIV so that precautions could be taken during the pregnancy and during the child's delivery to help increase the odds that the child that the child doesn't have AIDS or HIV - - . . . I believe that falls squarely within the parameters of "[A]" under the severe abuse

definition, the knowing exposure of a child to [abuse or neglect].

> I think that exposes a child to danger. Even if it's only 5 to 8% it's exposing a child to danger. And I sort of prelim-ed [sic] my ruling when . . . [Mother] brought something from the health department that said, "Hey, you're not going to contract HIV by hugging, kissing, drinking after you, you're going to get it from blood, second thing right on the list, vaginal fluid. Well I got to believe there'd be a whole lot of that going on during a vaginal delivery of pregnancy.

> I just find that that act is atrocious, and I do believe it lines up squarely with the decisions we've made around here and across the state for years about drug use while pregnant. [H]ere you're not telling that you have a very serious disease so that the medical people can do something about it. And I believe that's severe abuse against the Mother. I specifically don't find that the Father had any part of that act of abuse.

On this issue, the trial court heard from Dr. Gary W. Stephens, Mother's perinatologist. Dr. Stephens explained that it was standard procedure to test all patients for HIV because there was a treatment protocol used during pregnancy and at delivery to reduce the risk of transmitting the disease to the baby if a patient tested positive. He explained that if the mother had a serious infection, her baby could also become infected and die. Dr. Stephens stated that without any preventive measures, a baby born through a vaginal delivery had a 5 to 8 % risk of contracting HIV during delivery.

According to Dr. Stephens, the testing procedure and risks to herself and her unborn child were explained to Mother and she signed a document to indicate that she understood the information provided. On the "Infectious History" form Mother filled out at her initial visit, she checked the boxes indicating she had a history of "trichomonas" and "chickenpox" but did not check the box indicating a history of HIV. Dr. Stephens recalled that Mother "adamantly refused" the standard HIV blood screen and implied that she had been tested in Florida and that the results were negative.

In finding severe abuse, the trial court expressly analogized Mother's failure to take action in view of her HIV status to cases in which mothers used unlawful drugs while pregnant thereby exposing their unborn children to a risk of harmful side effects. We think the comparison is apt. This Court has observed:

In ***In re M.J.J.*** . . ., a pregnant mother gave birth to a child who, like herself, tested positive at birth for methamphetamines and opiates. The child was born with tremors, but otherwise developed normally. Despite the fact that the child developed well, the court notes that "the healthy development of the child in this case does not diminish the severity of the harm to which the child was exposed." This Court affirmed the trial court's finding that, "by taking this illegal controlled substance [of methamphetamines], Mother had exposed M.J.J. to a substantial risk of great bodily injury." The court concluded that "the record clearly supports the trial court's finding that Mother's prenatal drug use constituted severe child abuse for purposes of parental rights termination."

***Cornelius v. Dep't of Childrens' Svs***., 314 S.W.3d 902, 910 (Tenn. Ct. App. 2009) (internal citations omitted).

The evidence does not preponderate against the trial court's finding, made by clear and convincing evidence, that Mother subjected Keara to severe child abuse by knowingly failing to disclose her HIV status – even after the risks were directly presented to her – so that available preventive measures could be undertaken to protect the baby. Mother argues that, statistically speaking, a 5 to 8% risk of contracting HIV during delivery is too low a risk to demonstrate "neglect that is *likely* to cause great bodily harm or death." (Emphasis added.) Mother misconstrues the import of this statutory language as applied to the facts of this case. The issue is not the percentage risk of contracting the disease but rather what the probable consequences are if the disease was in fact contracted. When viewed in these latter terms, it is clear that those consequences would be "great bodily harm or death." As it turned out, Keara did have anti-HIV antibodies in her blood, indicating that she had been exposed to the disease.

V.

A.

Both Mother and Father challenge the trial court's finding that they subjected Keara to severe child abuse by neglecting her essential nutritional and physical needs. We return to the definition of severe child abuse under Tenn. Code Ann. § 37-1-102(b)(23)(A)(i)(2010):

"Severe child abuse" means:

The knowing exposure of a child to or the knowing failure to protect a child from abuse or neglect that is likely to cause serious bodily injury or death and the knowing use of force on a child that is likely to cause serious bodily injury or death;

As to this particular issue of "severe child abuse," the trial court found that Keara was a victim of severe child abuse as a result of both parents' "knowing failure to meet [her] basic life sustaining need for nutrition and physical stimulation. . . ." Mother and Father respond that the proof is lacking that they, or either of them, knowingly exposed or failed to protect Keara from such neglect.

In its bench ruling, the trial court found as follows:

> Let's look at [Keara's] failure to thrive during the early years. I don't think there's much question that [Keara] wasn't thriving under the care of her parents, . . . that she was just on the verge of starving to death, according to Dr. Sparrow, who testified at one point she had weeks or months to live unless something was done.
>
> Her legs were drawn up from lack of use. No other cause of that's been pointed out to me in the record. I can't logically deduce any other cause than setting [sic] in her seat and being fed with bottles all the time and wasn't getting the nutrition.
>
> I don't believe [Mother] and [Father] tried to hurt this child, I believe they love this child, but I believe that by failing to follow-up with what the doctors ordered, by failing to see the nutritionist, by failing to see the therapist, by failing to see those folks that they were told to see at the doctors visits, and by failing to learn how to properly feed the child, by failing to give the child enough food, that they were killing this child. And if the child hadn't been taken away from them the child would be dead.
>
> And I'm not sure from their testimony today, from their actions in this court, that they understand how close that [they] came to killing this child. Don't know that they get that. I think that they failed to protect this child from neglect by failing to ensure the child had proper nutrition.

-12-

The proof at trial showed that Keara began life as a healthy baby with no apparent health concerns noted. Although Mother and Father reported sufficient numbers and quantities of formula feedings, week after week went by and Keara failed to regain her birth weight. Despite the repeated efforts of her doctors and other providers to educate and guide the parents in proper feeding protocol, Mother and Father failed to ensure that the child received even "baseline nutrition" – enough calories and protein to enable her to grow. Mother and Father ignored directions to discontinue using a bottle and to feed Keara solid foods; by the time she was removed, her liquid intake had actually increased to some eight bottles of milk and juice a day. When referred to a nutritionist to reinforce the doctors' instructions, Mother and Father took Keara for an initial visit and failed to return despite her worsening condition. As to her physical needs, Keara missed nearly every developmental milestone and her legs evidenced muscular atrophy to the point that, as a 15-month old toddler, she was unable to stand on her own, much less walk. Mother and Father never began physical therapy as directed. At the same time, during her frequent check-ups, Mother and Father provided information about Keara's food intake and the milestones the child purportedly reached that were, at best, "inconsistent" with her outward appearance and her doctors' observations.

Boiled down, the evidence is substantial that, at nearly a year and a half old, Keara subsisted almost exclusively on a liquid diet and was left to herself, with little, if any, physical stimulation. When her pediatricians called for DCS to intervene, her head measurement had decreased dramatically since her last check-up, indicating a real possibility of brain damage. Dr. Sparrow opined that without immediate intervention and adequate nutrition, Keara would have died or lapsed into a vegetative state. On our review, we conclude that the evidence overwhelmingly establishes Keara as a severely abused child who was suffering the effects of knowing nutritional and physical neglect in her parents' care. Accordingly, the evidence does not preponderate against the trial court's conclusion that this ground for termination was clearly and convincingly proven.

B.

Mother and Father also challenge the trial court's finding of severe abuse under Tenn. Code Ann. § 37-1-102(b)(23)(B). That section defines severe child abuse as:

> Specific brutality, abuse or neglect towards a child that in the opinion of qualified experts has caused or will reasonably be expected to produce severe psychosis, severe neurotic disorder, severe depression, severe developmental delay or intellectual disability, or severe impairment of the child's ability to function

-13-

adequately in the child's environment, and the knowing failure
to protect a child from such conduct; . . . .

Based on the testimony of Dr. Sparrow and Dr. Weinstein, the trial court found that Mother and Father "did neglect their child's basic needs to the extent of causing the child to suffer from severe developmental delay and severe impairment of the child's ability to function adequately in the child's environment." The court elaborated on its finding as follows:

I also think that that lack of proper nutrition, proper exercise, and proper social interaction is a specific incidence of neglect. And that in the opinion of qualified experts that I've heard in this trial, caused or will be expected to cause, severe developmental delay in this [C]hild, severe impairment of the [C]hild's ability to function adequately in her environment.

And it's one way or the other; either both parents participated or one failed to protect [Keara] from the neglect of the other parent. It has to be one or the other. I believe part "[A]" and "[B]" [of the statute applies]. So I have found the ground of severe abuse.

The trial court added that Keara suffered injuries

that were most plainly evidence [sic] at the time of her removal into protective custody . . . and in [her] first few weeks of foster care. It remains to be seen whether Keara . . . shall ever fully recover from the injuries caused by her parents' extreme neglect.

Mother and Father contend that subsection (B) of the statute requires proof that their conduct was "knowing" in order to support a finding of severe child abuse leading to termination on this ground. Father correctly notes that this Court has recently addressed the element of knowledge in the context of Tenn. Code Ann. § 37-1-102(b)(23)(B). In the case of ***In re Samaria S.,*** 347 S.W. 3d 188 (Tenn. Ct. App. 2011)[1], the Western Section of this Court considered a dependency and neglect case in which the mother of prematurely-born twins appealed from the finding under subsection (B) that she severely abused the children by failing to provide them with proper nutrition. Despite receiving extensive instruction on the care and feeding of premature infants, mother returned two weeks later, first with "Boy

---

[1]We note that the opinion in this case was filed on March 8, 2011, only weeks before the final hearing date in the present case.

Twin," who was near death, and then with "Girl Twin," and both were suffering from severe malnutrition and dehydration. Scheduled home health services, provided at no cost to mother for herself and the babies, never occurred because mother moved and failed to provide her new address to the agency. At trial, mother stipulated that the twins were dependent and neglected, but denied that she had committed severe child abuse resulting in their "failure to thrive/malnutrition."

On appeal, this Court found that mother subjected Boy Twin to severe child abuse under both subsections (A) and (B) of Section 37-1-102(b)(23). Mother argued that, before the first clause of subsection (B) can be relied upon, there must be a showing of "knowing" conduct. To reiterate, that part of subsection (B) defines severe child abuse as

> [s]pecific brutality, abuse or neglect towards a child that in the opinion of qualified experts has caused or will reasonably be expected to produce severe psychosis, severe neurotic disorder, severe depression, severe developmental delay or retardation, or severe impairment of the child's ability to function adequately in the child's environment. . . .

Tenn. Code Ann. § 37-1-102(b)(23)(B). Noting that the interpretation of the definition of "severe child abuse" in subsection (B) was an issue of first impression, this Court considered rules of statutory construction, decisions of other states, and the precise language of the Tennessee statute in rejecting Mother's argument. *Id*. at 205.

Returning to the present case, Father strenuously argues that *In re Samaria S.* was wrongly decided and urges us to reach a different result. While acknowledging that "knowing" conduct is not an element expressly included in the first part of subsection (B), he contends that, because the present case involves a termination of parental rights, it is a proceeding "almost quasi-criminal" in nature that should require intentional, "knowing" conduct to sustain a finding of severe child abuse. We first point out that we expressly limited our holding in *Samaria S*. to dependency and neglect proceedings and expressed "no opinion on the interpretation of Section 37-1-102(b)(23)(B) as applied in a proceeding to terminate parental rights." *Id*. at 205, n.24. As it stands, then, we must determine whether "knowing" conduct is required under the statute in a termination case. To that end, we consider the analysis utilized by the *Samaria S*. Court in a dependency and neglect proceeding. We quote extensively from that opinion as follows:

> [W]e address the interpretation of "severe child abuse" in subsection (B) of Section 37-1-102(b)(23). In interpreting this statute, we must "carry out legislative intent without broadening

or restricting the statute beyond its intended scope." The statute should be read naturally and reasonably, with the presumption that the legislature says what it means and means what it says. If the language of a statute is clear, we must apply the plain meaning of the statute without complicating the task. The statute should not be interpreted to render any part of it meaningless or superfluous.

* * *

Conspicuously absent from the first portion of [subsection (B)] is the term "knowing." The omission of "knowing" in the first part of subsection (B), applicable to the perpetrator of the abuse or neglect, could be construed to suggest that the child will be considered the victim of "severe child abuse" if the statutory requirements are met, regardless of the extent of the perpetrator's knowledge. Moreover, reading the statute naturally, the word "knowing" in the last part of the subsection appears to refer to an enabler of the abuse or neglect, not to the perpetrator.

In past cases, when presented with an issue of first impression, we have on occasion looked to decisions of other states applying similar statutory provisions. Our research of child protection statutes in other states revealed no other state that uses a statutory definition of "severe child abuse" similar to the definition in Subsection (B) of Section 37-1-102(b)(23). We did, however, find some commonality in the overall approach used across the country in child protection statutes. Although Mother argues that an interpretation of subsection (B) as "outcome determinative" would be an anomaly, our research indicates that having a component of the child protection statutes that focuses on the effect of the parent's conduct on the child, rather than focusing on the parent's intent or knowledge, is not unusual.

In *New Jersey Division of Youth & Family Services v. A.R.G.*[2], the New Jersey intermediate appellate court considered the circumstances under which state child protection statutes relieved

---

[2] *See* **N.J. Div. of Youth & Family Servs. v. A.R.G. (In re C.R.G.)**, 361 N.J. Super. 46, 824 A.2d 213 (N.J. Super. Ct. App. Div. 2003), *aff'd in pertinent part*, 179 N.J. 264, 286, 845 A.2d 106 (N.J. 2004).

state authorities of the obligation to provide reasonable efforts to reunify the parent and child. In a "scholarly" opinion, the intermediate appellate court looked at the history of the Federal Adoption and Safe Families Act of 1997 (ASFA) and its interplay with child protection statutes. In doing so, the New Jersey intermediate appellate court reviewed child protection statutes in numerous states, including Tennessee. Looking at the "common threads[] or themes" in the various state approaches, the court observed:

> We conclude that the term "aggravated circumstances" [excusing the requirement to use reasonable efforts] embodies the concept that the nature of the abuse or neglect must have been so severe or repetitive that to attempt reunification would jeopardize and compromise the safety of the child and would place the child in a position of an unreasonable risk to be reabused.
>
> Moreover, any circumstances that increase the severity of the abuse or neglect, or add to its injurious consequences, equates to "aggravated circumstances." Whether couched as "severe child abuse or neglect," "serious child abuse or neglect," or "severe physical injury" of a singular, chronic, recurrent, or repetitive nature, where the circumstances created by the parent's conduct create an unacceptably high risk to the health, safety and welfare of the child, they are "aggravated" to the extent that the child welfare agency . . . may bypass reasonable efforts of reunification.

In the Tennessee statute, the definition of severe child abuse in subsection (B) explicitly focuses on the "injurious consequences" of the perpetrator's "specific" neglect, even going so far as to expressly require "the opinion of qualified experts" on those expected consequences. In that sense, subsection (B) is structured differently and has a different emphasis than subsection (A), which focuses explicitly on whether the perpetrator or the enabler

-17-

had knowledge that the abuse or neglect was "likely to cause great bodily harm or death." We are obliged to read both statutory subsections in pari materia, so as to respect what each subsection is intended to address, and in a way that does not make subsection (B) redundant or superfluous.

From our review, subsection (B) appears intended to address precisely the circumstance in this case, namely, child victims who are especially fragile and vulnerable and less able to survive the risk inherent in reunification. The failure to properly nourish a fourteen-year-old child for a two-week period, while abusive, would not have the catastrophic consequences of the failure to nourish a premature infant who is only days old. Subsection (B) appears intended to be broad enough to include a perpetrator's conduct toward an especially vulnerable child victim that, regardless of the perpetrator's knowledge or intent, creates "an unacceptably high risk to the health, safety and welfare of the child."

From our reading of subsection (B), we find it to be "plain and unambiguous as written." Reading Section 37-1-102(b)(23) as a whole, it appears that the omission of the term "knowing" in the first part of subsection (B) was intentional, not merely inadvertent or the result of inartful drafting. The omission, then, means that specific knowledge is not required for a finding of severe child abuse by the perpetrator under this subsection. This conclusion is consistent with the statutory scheme as a whole.

*Id*. at 203-205. (Internal citations, footnotes, and emphasis supplied by ***Samaria S.*** Court omitted; one footnote added.) We agree with the interpretation of the statute by the ***Samaria S***. Court. Moreover, on our considered review, we believe the analysis is equally applicable in cases involving the termination of parental rights. Accordingly, in the present case, the trial court was not required to find that Mother and Father "knowingly" neglected Keara in order to support a finding of severe child abuse under Tenn. Code Ann. § 37-1-102(b)(23)(B).

Turning then, to the proof at trial, Dr. Sparrow spoke specifically to Mother's and Father's neglect of Keara and its "injurious consequences." At over a year and a half, she had "fallen off" the growth chart and she could not walk, stand, or speak at all. Further, by the time of her removal, Keara's head measurement had again fallen, this time from the 25th to the 10th percentile. Dr. Sparrow observed:

> That's a reflection of extremes of lack of nutrition, in this case. Not enough protein, not enough calories. She had enough calories to maintain a little weight gain and get her on the graph, or close to 3rd percentile, and maintain a head circumference that exceeded that until that point. And that's a bad sign, because that means not only is the brain not able to grow but there may be damage that may be irrevocable.

Asked to describe the probable outcome for Keara had she remained malnourished, Dr. Sparrow testified that she would have experienced "[g]lobal devastating results in her neuro developmental status," including "[n]o language, no interaction, no eating, no motor skills, no fine motor skills, and some sort of vegetative state. . . ."

On our review, such expert testimony clearly and convincingly establishes that Keara was subjected by Mother and Father, her only caregivers, to neglect that was reasonably calculated and did lead to severe developmental delays and an inability to function adequately in her environment. There is clear evidence to support the trial court's finding of severe abuse pursuant to Tenn. Code Ann. § 37-1-102(b)(23)(B). Hence, the evidence does not preponderate against the trial court's findings on this issue.

VI.

Next, Father asserts that the trial court erroneously terminated his parental rights based on "the purported expert testimony of two Doctors . . . without first analyzing the reliability of the relevant scientific methods, processes, and data upon which [they] relied" in support of their opinions that Keara was neglected. Father refers to the testimony of Drs. Sparrow and Weinstein and their ultimate conclusions that Keara's "failure to thrive" and developmental delays were the result of parental neglect. Father concedes that this issue was not preserved for appellate review, but concludes that it is a plain error of great "magnitude" that must be considered. We disagree that there is any error.

First, as Father concedes, both Dr. Sparrow, a pediatrician, and Dr. Weinstein, a psyiatrist, testified, without objection, as experts in their respective fields. Dr. Weinstein's expert qualifications as a pediatric rehabilitation development specialist for 28 years were stipulated. Further, although Dr. Sparrow was not technically acknowledged by the parents as an expert before testifying, her qualifications as a pediatrician for over 25 years, with the past 15 years spent overseeing the work of other providers in her pediatric practice group, were presented. In our view, Dr. Sparrow was effectively accepted and did testify as an expert in pediatrics without challenge. Our conclusion is further bolstered by the fact that when the trial court asked counsel, at the start of the hearing, whether they objected to taking

"the expert testimony" out of order, beginning with Dr. Sparrow, counsel for Mother and Father both replied, "No, Your Honor." We conclude that there was no direct challenge to the qualifications of either of these witnesses.

Furthermore, even had this issue been properly raised, we would reject Father's challenge to the reliability of the testimony of either Dr. Sparrow or Dr. Weinstein. Questions concerning the admissibility, qualifications, relevancy and competency of expert testimony are committed to the sound discretion of the trial court whose decision will not be overturned on appeal without a clear showing of abuse of that discretion. *McDaniel v. CSX Transp., Inc*., 955 S.W.2d 257, 263-264 (Tenn. 1997). In this regard, we have observed:

> To assist the trier of fact in this "gatekeeping" function, Rule 702 of the Tennessee Rules of Evidence permits an expert to testify "in the form of an opinion or otherwise," only where the "scientific, technical, or other specialized knowledge" offered by the witness will substantially assist the trier of fact. Tenn. R. Evid. 702. Rule 703 requires an expert's opinion to be supported by trustworthy facts or data "of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject." Tenn. R. Evid. 703. The determinative factor is "whether the witness's qualifications authorize him or her to give an informed opinion on the subject at issue."

*In re Malichi C*., No. E2009-00055-COA-R3-PT, 2009 WL 3270178 at *8 (Tenn. Ct. App., E.S., filed Oct. 10, 2009) (internal citations omitted). In the present case, the doctors essentially recounted the history of Keara's lack of growth and development as documented in her chart and as observed at her many office visits both before and after her removal. Dr. Sparrow gave a visit-by-visit account of Keara's time at the Center since her birth, where she began as a healthy infant with no noted concerns, to her emergency removal nearly 17 months later, to the vast improvements seen soon after she entered foster care. For her part, Dr. Weinstein similarly testified to the "large weakness" and lack of development she observed on examination of Keara.

Based on Keara's documented history and their own observations, Dr. Sparrow essentially concluded that Keara was not growing because she was not being adequately fed and Dr. Weinstein concluded that Keara could not walk or stand because of "disuse" – that is, she had not been allowed or encouraged to use her legs. Under Tenn. R. Evid. 705, an expert "may testify in terms of opinion or inference and give reasons without prior disclosure of the underlying facts and data, unless the court requires otherwise." In this regard, the "court shall disallow testimony in the form of an opinion or inference if the underlying facts

or data indicate lack of trustworthiness." Tenn. R. Evid. 703. In our view, the trial court did not err in admitting both doctors' testimony on the determinative issue of the cause of Keara's lack of growth and development – that Keara was subjected to malnutrition and neglect in Mother's and Father's care.

In summary, it was the parents' burden to expose any weaknesses in the expert proof, and Father and Mother failed to challenge the experts' qualifications or the substance of their testimony at any point. "Failing to make a timely, specific objection in the trial court prevents a litigant from challenging the introduction of inadmissible evidence for the first time on appeal." *Wright v. United Services Auto. Ass'n*, 789 S.W.2d 911, 914 (Tenn. Ct. App. 1990). There is nothing to support a conclusion that the doctors' testimony was erroneously admitted as being based on untrustworthy methods or data. In summary, this issue was waived; in any event, it lacks merit.

VII.

Next, Father asserts that the trial court erred in granting DCS's petition because it filed the petition shortly after the department entered into permanency plans that included the goal of reunifying the Children with Mother and Father. The gist of his argument is that DCS may not rely solely on the ground of severe child abuse to support termination when it has expressly agreed to work toward reuniting parents with their children. Again, Father concedes this issue was not presented to the trial court, but contends that it should be addressed on appeal in the interest of justice.

In support of his position, Father points to this Court's decision in *State v. R.S. & K.S.*, No. M2002-00919-COA-R3-CV, 2003 WL 22098035 (Tenn. Ct. App. M.S., filed Sept. 11, 2003). In that case, DCS entered into several permanency plans with the parents that included "return to parents" as the *only* goal. DCS ultimately filed a petition to terminate that did not allege severe abuse as a ground for termination. Nonetheless, at trial, DCS repeatedly referenced a "prior adjudicatory order" finding that the children had been sexually, and thus, severely, abused by their father. DCS counsel argued that such a finding, in and of itself, was a ground for termination, prompting this Court to remark:

> This court has previously indicated that DCS cannot rely on a *prior* finding of severe abuse as the ground for termination where DCS has entered into permanency plan agreements with parents with the goal of returning the child to the home. While DCS may initially determine that the abuse was so severe as to justify a goal of adoption and termination of the parents' rights, if DCS chooses otherwise and leads parents to believe they can regain

custody of the child by complying with a permanency plan's requirements, *it is fundamentally unfair for DCS to rely on pre-removal abuse*, rather than the parents' compliance in the intervening years, as a basis to terminate parental rights.

*Id*. at *4, n.16. (Emphasis added). As stated earlier in this opinion, the trial court in the present case terminated Mother's and Father's rights based on its own finding of *multiple* instances of severe child abuse. Tenn. Code Ann. Sec. 36-1-113(g)(4) provides that severe child abuse is a ground for termination, in relevant part, as follows:

> The parent or guardian has been found to have committed severe child abuse as defined in § 37-1-102, under any prior order of a court or is found by the court hearing the petition to terminate parental rights . . . to have committed severe child abuse against the child who is the subject of the petition . . . .

The record before us does not include the permanency plans for these Children, but other parts of the record indicate that there was a *concurrent* goal of reunification and adoption in their permanency plans. Most significantly, there is no "prior order" in the present case adjudicating the Children as having been severely abused by Father (or Mother), and DCS does not allege any prior order as a ground for termination. To the contrary, the record contains a June 9, 2010, order of the juvenile court which expressly provides that the present case was "set for [a hearing for] determination of the claim of severe child abuse" contemporaneously with the hearing on the petition to terminate. In short, Father's reliance on *In R.S. and K.S.*, avails him nothing.

We reject this issue on two bases – first, because it is being raised for the first time on appeal, and, alternatively, because the issue is without merit.

VIII.

Both parents challenge the trial court's finding that termination of their rights is in the best interest of the Children. Father contends that certain factors weigh against termination – he points to his completion of many of the permanency plan's requirements and his view that it is not best for these young siblings to be raised separately. Mother contends that the best interest of the Children could not have been clearly and convincingly established in this case because DCS never considered placement of the Children with her and Father as an

option. We review the trial court's best-interest determination, guided by the relevant factors set forth in Tenn. Code Ann. § 36-1-113(i).[3]

At trial, the foster father[4], a stay-at-home parent and former surgical nurse, testified that when Keara came to his home, she joined his five other adopted children ranging in age from 4 to 14. At first, she would not put her legs down to stand and could not actually crawl; she used her arms and right leg to drag herself around and did not speak words – she pointed or "grunted" to indicate what she wanted. She did not want solid foods, but soon developed a good appetite and now "eats just about anything." In addition to seeing her doctors and

---

[3]That section provides:

> (i) In determining whether termination of parental or guardianship rights is in the best interest of the child pursuant to this part, the court shall consider, but is not limited to, the following:
> (1) Whether the parent or guardian has made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the child's best interest to be in the home of the parent or guardian;
> (2) Whether the parent or guardian has failed to effect a lasting adjustment after reasonable efforts by available social services agencies for such duration of time that lasting adjustment does not reasonably appear possible;
> (3) Whether the parent or guardian has maintained regular visitation or other contact with the child;
> (4) Whether a meaningful relationship has otherwise been established between the parent or guardian and the child;
> (5) The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological and medical condition;
> (6) Whether the parent or guardian, or other person residing with the parent or guardian, has shown brutality, physical, sexual, emotional or psychological abuse, or neglect toward the child, or another child or adult in the family or household;
> (7) Whether the physical environment of the parent's or guardian's home is healthy and safe, whether there is criminal activity in the home, or whether there is such use of alcohol or controlled substances as may render the parent or guardian consistently unable to care for the child in a safe and stable manner;
> (8) Whether the parent's or guardian's mental and/or emotional status would be detrimental to the child or prevent the parent or guardian from effectively providing safe and stable care and supervision for the child; or
> (9) Whether the parent or guardian has paid child support consistent with the child support guidelines promulgated by the department pursuant to § 36-5-101.

[4]In order to maintain their anonymity, the foster parent and his partner were not referred to by name at trial and are not otherwise identified in the record before us.

-23-

multiple therapists, foster father worked with Keara doing therapy exercises at home. Keara had shown great improvement since joining his family – she walked with the aid of braces and orthotics in her shoes, played, and spoke in three to four-word sentences. Overall, she was healthy, but still had problems with balance, coordination and motor skills and exhibited low muscle tone. Foster father felt that Keara was making quick progress in part due to trying to mimic the things her 4-year old foster brother did. Foster father intended to adopt Keara if given the chance. He was also willing to take in Sierra so that the Children could remain together, but understood that DCS had decided against that option.

Sierra's foster mother testified that she picked her up from the hospital a few days after she was born. Sierra, who was born by C-section, took anti-HIV medications and thus far had tested negative. Foster mother had two other daughters at home, ages 14 and 17. Foster mother stated that Sierra was happy and healthy and she and her husband wanted to adopt her.

Deborah Daugherty, the Children's DCS case worker, noted that they were placed in separate foster homes because Keara had first been placed with a family that already had five other children. An "exception" to place Sierra there as well was denied and DCS decided against moving both Children to another home because Keara's doctors were concerned that she could suffer permanent developmental damage if she were removed from the foster family with whom she had closely bonded. Daugherty described the Children as "thriving" in their current homes.

In its bench ruling, the trial court observed: "As far as best interest of . . . [Keara], again, I am concerned, like everyone else in the room, that we have two full sisters that have the potential for not being together." Despite its concern, the court ultimately concluded that they were thriving in "great" foster homes, and "both children have a shot at permanency no matter what the decision as far as whether they'll live together full-time or not." Expressly considering each of the statutory factors, the trial court set forth its best-interest analysis as follows:

> The Court . . . finds by clear and convincing evidence that factors
> (1), (2), (5), (6), and (8) weigh heavily in favor of termination.
> More particularly, with respect to factor (1), the Court finds that
> the parents . . . have never acknowledged any responsibility or
> understanding that they neglected to meet Keara's most basic
> needs and because of this fact, the parents have failed to make
> such an adjustment of circumstance, conduct, or conditions as to
> make it safe and in the [C]hildren's best interest to be placed in
> their care.

As for factor (2), the parents . . . during months of visitation resisted parenting instruction and their hostility towards such helpful instruction lead to the discontinuation of further efforts to develop parenting skills, and because of these facts, the Court is constrained to find that the parents have failed to effect a lasting adjustment after reasonable efforts by available social service agencies for such duration of time that lasting adjustment does not reasonably appear possible.

As for factor (5), without any acknowledgment from the parents that they did anything to harm Keara and the fact that the [C]hildren have developed close, beneficial, familial ties to their respective foster families, this Court has no doubt whatsoever that a change of caretakers to make a placement with the parents would most certainly have a devastating and harmful impact on the [C]hildren's physical health.

As to factor (8), . . . the neglect of Keara [ ] by her parents was profound, protracted, and persistent, despite the repeated efforts of the [C]hild's medical care providers to educate the parents on how to meet Keara's most basic life sustaining needs, and the referrals to other specialists to intervene, educate, and rehabilitate the [C]hild from the ongoing and ever worsening effects of the parents' neglect. Again the lack of insight by the parents into how their . . . omissions in this case led nearly to the death of Keara, well illustrate that the mental condition or emotional status of both parents . . . would be clearly detrimental to the [C]hildren and would prevent the parents from effectively providing safe and stable care and supervision . . . .

The trial court further found that although Mother and Father consistently visited and supported the Children and, at times, demonstrated love and affection for them, those factors failed to carry sufficient weight to avoid terminating their rights.

The evidence does not preponderate against the court's findings and conclusion. To be sure, the trial court's comments make clear that it did consider, in the parents' favor, the positive steps Mother and Father had taken since the Children's removal; and the fact that these sisters were being raised by different foster families. At the same time, it is clear that the trial court balanced such considerations against the extreme neglect that Keara suffered while with her parents and the need to protect Sierra from the same fate. Significantly, the

court declined to return the Children to Mother and Father after concluding that nothing indicated that the situation would be any different if the Children were placed with them. The observations of both Children's case workers are instructive.

Keara's case manager, Ms. Brown, felt Mother and Father wanted the best for the Children, but lacked "the ability mentally and emotionally to even understand it, much less provide it." During visits, Father was openly resistant to advice or direction from Brown and other staff, while Mother tried, but failed to follow through. She summarized the visits as "unremarkable, there's no huge event, there's just no parenting displayed." In particular, proper feeding was addressed during the visits, and the parents were instructed and reminded that Keara needed to sit down and eat her lunch first. Despite this, Keara always ate very little because Mother and Father allowed her to play, insisted she liked to walk around while she ate, or fed her candy instead.

Sierra's case manager, Corrine Gaver, similarly observed that Mother and Father were hostile to her suggested parenting techniques. Further, Mother and Father specifically related that they felt someone was "out to get them" because they were a bi-racial couple and they did not understand why the Children were in foster care. Gaver recalled that when Sierra cried, the parents placed her on the floor and pointedly ignored her suggestion that it would comfort her, as a newborn, to be held instead. Asked whether the parents had expressed concern and love for Sierra, Gaver replied, "I don't doubt that there is love for this child, I would not agree with the concern part."

Since entering foster care, albeit in separate homes, the Children were thriving. Keara, in particular, had made remarkable strides in her overall growth and development and was continuing to show improvement in all areas. There was no evidence to suggest that had Keara been returned to her parents' custody, they would have acted upon the advice and recommendations of her doctors to continue her progress. In short, the trial court concluded that the best option for the Children, whether or not they were placed together, was to terminate Mother's and Father's rights and permit the Children to be raised by families that could provide them, at the very least, with the fundamental care that they required. The evidence does not preponderate against the trial court's best-interest determination.

Lastly, based on the severe abuse of Keara by both Mother and Father, as discussed above, DCS was relieved of any obligation to work toward restoring custody of Sierra to Mother and Father. *See generally*, Tenn. Code Ann. § 37-1-166 (2010) (providing that DCS is not required to exercise "reasonable efforts" to reunify a child with her parent(s) where the parent(s) has subjected a sibling of that child to "aggravating circumstances") and §36-1-102(9) (2010) (defining "aggravating circumstances to include "severe child abuse"). As a

result, we decline Mother's request to reverse the termination of her rights to Sierra, which termination was based solely upon the abuse of Keara. The trial court did not err in doing so. *See* Tenn. Code Ann. §36-1-113(g)(4).

IX.

The judgment of the trial court is affirmed. This case is remanded, pursuant to applicable law, for enforcement of the trial court's judgment and for the collection of costs assessed below. Costs on appeal are taxed to the appellants, Kenneth J. and Christie J.

_____
CHARLES D. SUSANO, JR., JUDGE