IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
August 6, 2013 Session

IN RE CHRISTOPHER S. ET AL.

Appeal from the Circuit Court for Bradley County
No. V-11-225     J. Michael Sharp, Judge

No. E2012-02349-COA-R3-PT-FILED-SEPTEMBER 27, 2013

This is a termination of parental rights case focusing on Christopher S., Jr. ("C.J.") and Lilly S., the minor children ("Children") of Tawana S. ("Mother") and Christopher S., Sr. ("Father"). The Children were taken into protective custody by the Tennessee Department of Children's Services ("DCS") on October 14, 2010. On September 22, 2011, DCS filed a petition to terminate the parental rights of both parents. Following a bench trial held on April 27, 2012, and July 11, 2012, the trial court granted the petition upon its finding, by clear and convincing evidence, that the parents had committed severe child abuse and were mentally incompetent to provide for the further care and supervision of the Children. The court further found, by clear and convincing evidence, that termination of Father's and Mother's parental rights was in the Children's best interests. Father and Mother have appealed. We reverse the finding that Father and Mother were mentally incompetent to provide for the further care and supervision of the Children. We affirm the trial court's judgment in all other respects, including the termination of Father's and Mother's parental rights on the statutory ground of severe child abuse.

**Tenn. R. App. P. 3; Judgment of the Circuit Court
Affirmed in Part, Reversed in Part; Case Remanded**

THOMAS R. FRIERSON, II, J., delivered the opinion of the Court, in which CHARLES D. SUSANO, JR., P.J., and D. MICHAEL SWINEY, J., joined.

Philip M. Jacobs, Cleveland, Tennessee, for the appellants, Christopher S. and Tawana S.

Robert E. Cooper, Jr., Attorney General and Reporter, and Mary Byrd Ferrara, Assistant Attorney General, Nashville, Tennessee, for the appellee, Tennessee Department of Children's Services.

# OPINION

## I. Factual and Procedural Background

The incident leading to the Children's removal from the parents' home occurred on October 14, 2010, when C.J. was four years, eight months old and Lilly was two years, eleven months old. At that time, the family had lived in a subsidized housing apartment complex in Cleveland, Tennessee, for several years. An investigator with Children's Protective Services, Pat Vasterling, acting on an anonymous referral, entered the parents' two-story apartment at approximately 1:30 p.m. Mr. Vasterling talked with the parents, who had Lilly with them on the first level. He detected the smell of urine but also saw a carpet cleaning machine and thought it appeared as if someone had recently cleaned the unit. Mr. Vasterling smelled bacon cooking and was told by the parents that it was for the family's first meal of the day.

When Mr. Vasterling requested to see the home's upper level, Father asked him to wait. Mother stepped around them and headed up the stairs. Mr. Vasterling followed Mother and found her untying a strap that was joined to a piece of thin rope with a slip knot and tied from the doorknob of one door to the knob of another door across the hall. After Mother untied the strap, Mr. Vasterling entered the room, which was unoccupied and appeared to be a bedroom of a young girl. In back of that room through a door, Mr. Vasterling found C.J. standing on the balls of his feet, wearing only a tee-shirt, and making sounds. There was a soiled diaper on the floor, and the caseworker reported the room smelled so strongly of urine that he nearly became physically ill. C.J. did not respond when the caseworker asked his name.

Upon questioning, the parents told Mr. Vasterling that this was the first time they had strapped C.J. into his room and that he had been in the room no longer than fifteen minutes. A maintenance worker, Ronald Burns, testified, however, that he had arrived at the apartment at 8:10 a.m. that morning to repair the air conditioning unit. Mr. Burns was in and out of the apartment throughout the morning and was still present when the DCS caseworker arrived at 1:30 p.m. While he was working outside and from the time of his arrival, Mr. Burns heard "goo-ing, gagging, and moaning" coming from the back bedroom. He did not hear anyone moving in the apartment until about 10:15 or 10:30 a.m. when he saw the parents come downstairs with Lilly. During the five hours he was there, Mr. Burns did not see C.J.

DCS case manager Candace Milligan, who took care of the Children immediately after their removal from the parents' home and continued to manage their case, testified that both Children smelled heavily of urine and were very hungry when first taken into protective custody. The apartment complex manager, Wendy Quigley, testified that the parents had

-2-

repeatedly failed home inspections for poor housekeeping but eventually cleaned the apartment well enough to pass inspections. The family moved from a two-bedroom to a three-bedroom apartment in September 2008. According to the manager, the parents failed two inspections of the first apartment due to cockroach infestation. The second apartment had been refurbished, but by early 2009, the parents began failing inspections again. The day before Mr. Vasterling investigated, the parents had passed an inspection on their third attempt, after failing by reason of dirty carpets and a strong urine scent. Father and Mother were evicted from the complex in February 2012.

At the time of the Children's removal in October 2010, the parents told DCS that something was wrong with C.J. because he could not speak. Mother admitted to DCS and at trial that the Children had not seen a doctor in approximately a year, although medical records indicated it had been longer. A pediatrician's note from a December 2008 visit to Cleveland Pediatrics revealed that the doctor referred C.J. to a specialist because the child was developmentally delayed. At trial, Mother denied having received a referral to a specialist. Bradley County Health Department records evinced that between October 2007 and November 2010, C.J. was only seen there to receive shots and vouchers for the Women, Infants, and Children ("WIC") program. On three occasions in 2008, a Health Department nutritionist or nurse noted recommending that C.J. be evaluated for hearing and speech delays. Mother called The TEAM Centers, Inc. ("TEAM") in September 2009 to request an appointment, indicating that C.J. had been nonverbal and continuously rocking back and forth since birth. Although the parents made several appointments with TEAM, they failed to appear with C.J. for any of them.

Once in protective custody, C.J. began therapy with a pediatric speech pathologist, Kara Herzog Knowles. Ms. Knowles testified that when she first observed C.J. at nearly five years of age, his auditory comprehension level was that of a 10-month-old child, and he could express himself only at the level of a thirteen-month-old child. With therapy and additional treatment provided through the school system, C.J. had progressed by the time of trial, learning to interact in games, pay attention to those speaking to him, verbalize two words spontaneously, and use some hand signals.

The Children's foster mother, S.B., testified that she and her husband had been the Children's foster parents since the Children were removed from Father's and Mother's home. S.B. described C.J. as like a "wild child" who "had been plucked out of the woods" when he first came to live with her family. According to S.B., neither C.J. nor Lilly could use eating utensils or a cup. Neither child was potty trained in October 2010. C.J. did not respond to spoken communication or speak any words; Lilly only said "kill-kill," referring to a hand-held video device. By the time of trial over eighteen months later, C.J., by then six, and Lilly, at four and a half, were potty trained, although C.J. still had occasional accidents. Both

Children were using a spoon, fork, and cup. Lilly could utter many words at an age-appropriate level. C.J. had been diagnosed with autism, and he had progressed to using signals, responding when spoken to, following directions, and interacting with adults and other children at home and school. S.B. and her husband, who also cared for three children of their own, expressed their desire to adopt C.J. and Lilly.

Two psychologists assessed Father's and Mother's mental capacity to parent. Dr. Burton Glennon testified at trial on behalf of the State while Dr. Tom Biller testified by deposition on behalf of the parents. Although their intelligence measurement results differed somewhat, Dr. Glennon and Dr. Biller agreed that both Father and Mother functioned for the most part in the low average range of intelligence. Dr. Glennon's results indicated that both parents were mildly intellectually disabled.[1] Although Father finished the eleventh grade, he could not read or write. Mother completed the tenth grade and was found by Dr. Biller to read at a ninth-grade level. Dr. Biller also found Mother's verbal skills to extend into the low end of an average intelligence range. Both psychologists agreed that Father and Mother could be capable of competent parenting if provided with significant intervention and supervision, as well as an ongoing and effective support system. Both experts stated that simple parenting instruction and home counseling of only one or two hours a week would be insufficient to help Father and Mother parent safely and competently. Neither psychologist found an indication of aggression or cruelty in either parent.

Upon the Children's removal, DCS filed a petition with the Bradley County Juvenile Court, alleging as to both Father and Mother that the Children were dependent and neglected. Following an adjudicatory hearing before the magistrate in December 2010, the juvenile court found, by clear and convincing evidence, that the Children were dependent and neglected and that both Father and Mother had committed severe child abuse. Following hearings conducted on February 14, 2011, and March 7, 2011, the juvenile court entered an adjudicatory order on May 27, 2011, affirming the magistrate's findings and determining the Children to be dependent and neglected due to severe child abuse and due to the parents' failure to provide proper supervision, proper care, medical care, or a proper and clean home environment. The parents appealed the juvenile court's determination of dependency and neglect to the Bradley County Circuit Court only on the ground of severe child abuse.

---

[1] We note that our Supreme Court has urged the use of "intellectual disability" in place of "mental retardation" whenever possible to avoid negative stereotypes and potentially hurtful terminology. *See Keen v. State*, 398 S.W.3d 594, 600 n.6 (Tenn. 2012) (citing the Tennessee General Assembly's 2010 amendment to Tennessee Code Annotated § 39-13-203, replacing the terms "mentally retarded" and "mental retardation" with "intellectual disability").

DCS filed its petition for termination of both parents' parental rights on September 22, 2011, alleging severe child abuse and stating that DCS would not work with the parents toward reunification because it believed the parents incapable of rehabilitation sufficient to ensure the Children's safety if returned to the parents' care. By agreement of the parties, the circuit court heard the appeal of the juvenile court ruling on severe child abuse in conjunction with the petition for termination.

A bench trial was held over two non-consecutive days on April 27 and July 11, 2012. Upon close of trial on July 11, 2012, DCS moved orally to amend the petition for termination of parental rights to conform to the evidence, seeking to plead an alternative ground of the parents' mental incompetence. The trial court granted the motion to amend the petition, and DCS filed a brief supporting its motion on July 30, 2012. In a Final Order entered September 26, 2012, the trial court terminated Father's and Mother's parental rights on the statutory grounds that both parents had committed severe child abuse and were mentally incompetent to parent. The court further found that termination of Father's and Mother's parental rights was in the best interest of the Children. The court entered an order correcting a clerical error in the Final Order on October 31, 2012. Father and Mother timely appealed.[2]

## II. Issues Presented

On appeal, Father and Mother present four issues, which we have restated as follows:

1.    Whether the trial court erred by finding clear and convincing evidence that Father and Mother committed severe child abuse and by terminating their parental rights based on that ground pursuant to Tennessee Code Annotated §§ 37-1-102(b)(23) (Supp. 2012) and 36-1-113(g)(4) (Supp. 2012).

2.    Whether the trial court erred by affirming the juvenile court's judgment that the Children were dependent and neglected based on the finding of severe child abuse.

3.    Whether the trial court erred by finding clear and convincing evidence that Father and Mother were mentally incompetent to parent and terminating their parental rights based on that ground pursuant to Tennessee Code Annotated § 36-1-113(g)(8).

_____

[2]Father and Mother subsequently filed a motion to remand this cause to the Circuit Court for determination of indigency and appointment of counsel. This Court granted the motion to remand on January 10, 2013. On remand, the Circuit Court found Father and Mother indigent and appointed their trial counsel to represent them on appeal.

4.    Whether the trial court erred by finding clear and convincing evidence that it was in the Children's best interest to terminate Father's and Mother's parental rights.

## III.  Standard of Review

In a termination of parental rights case, this Court has a duty to determine "whether the trial court's findings, made under a clear and convincing standard, are supported by a preponderance of the evidence." *In re F.R.R., III*, 193 S.W.3d 528, 530 (Tenn. 2006).  The trial court's findings of fact are reviewed *de novo* upon the record, accompanied by a presumption of correctness unless the evidence preponderates against those findings.  *Id.*; Tenn. R. App. P. 13(d).  Questions of law, however, are reviewed *de novo* with no presumption of correctness.  *In re Bernard T.*, 319 S.W.3d 586 (Tenn. 2010).  The trial court's determinations regarding witness credibility are entitled to great weight on appeal and shall not be disturbed absent clear and convincing evidence to the contrary.  *See Jones v. Garrett,* 92 S.W.3d 835, 838 (Tenn. 2002).

"Parents have a fundamental constitutional interest in the care and custody of their children under both the United States and Tennessee constitutions." *Keisling v. Keisling*, 92 S.W.3d 374, 378 (Tenn. 2002).  It is well established, however, that "this right is not absolute and parental rights may be terminated if there is clear and convincing evidence justifying such termination under the applicable statute." *In re Drinnon*, 776 S.W.2d 96, 97 (Tenn. Ct. App. 1988) (citing *Santosky v. Kramer*, 455 U.S. 745, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982)).  As our Supreme Court has instructed:

> In light of the constitutional dimension of the rights at stake in a termination proceeding under Tenn. Code Ann. § 36–1–113, the persons seeking to terminate these rights must prove all the elements of their case by clear and convincing evidence.  Tenn. Code Ann. § 36–1–113(c); *In re Adoption of A.M.H.*, 215 S.W.3d at 808–09; *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002).  The purpose of this heightened burden of proof is to minimize the possibility of erroneous decisions that result in an unwarranted termination of or interference with these rights. *In re Tiffany B.*, 228 S.W.3d 148, 155 (Tenn. Ct. App. 2007); *In re M.A.R.*, 183 S.W.3d 652, 660 (Tenn. Ct. App. 2005).  Clear and convincing evidence enables the fact-finder to form a firm belief or conviction regarding the truth of the facts, *In re Audrey S.*, 182 S.W.3d 838, 861 (Tenn. Ct. App. 2005), and eliminates any

serious or substantial doubt about the correctness of these factual findings. *In re Valentine*, 79 S.W.3d at 546; *State, Dep't of Children's Servs. v. Mims (In re N.B.)*, 285 S.W.3d 435, 447 (Tenn. Ct. App. 2008).

*In re Bernard T.,* 319 S.W.3d at 596.

## IV. Severe Child Abuse

One of the statutory grounds upon which the trial court terminated Father's and Mother's parental rights was their commission of severe child abuse against both Children. Tennessee Code Annotated § 36-1-113(g)(4), as relevant to this action, provides:

(g) Initiation of termination of parental or guardianship rights may be based upon any of the grounds listed in this subsection (g). The following grounds are cumulative and non-exclusive, so that listing conditions, acts or omissions in one ground does not prevent them from coming within another ground:

* * *

(4) The parent or guardian has been found to have committed severe child abuse as defined in § 37-1-102, under any prior order of a court or is found by the court hearing the petition to terminate parental rights or the petition for adoption to have committed severe child abuse against the child who is the subject of the petition or against any sibling or half-sibling of such child, or any other child residing temporarily or permanently in the home of such parent or guardian . . . .

Tennessee Code Annotated § 37-1-102(b)(23) defines "severe child abuse," in relevant part, as:

(A)(i) The knowing exposure of a child to or the knowing failure to protect a child from abuse or neglect that is likely to cause serious bodily injury or death and the knowing use of force on a child that is likely to cause serious bodily injury or death . . . .

(B) Specific brutality, abuse or neglect towards a child that in the opinion of qualified experts has caused or will reasonably be expected to produce severe psychosis, severe neurotic disorder, severe depression, severe developmental

delay or intellectual disability, or severe impairment of the child's ability to function adequately in the child's environment, and the knowing failure to protect a child from such conduct . . . .

As this Court has previously explained:

a parent's conduct is "knowing, and a parent acts or fails to act 'knowingly,' when . . . she has actual knowledge of the relevant facts and circumstances or when . . . she is either in deliberate ignorance of or in reckless disregard of the information that has been presented to . . . her."

*In re H.L.F.*, 297 S.W.3d 223, 236 (Tenn. Ct. App. 2009) (quoting *In re R.C.P.*, No. M2003-01143-COA-R3-PT, 2004 WL 1567122 at *7 (Tenn. Ct. App. July 13, 2004)).

In its order terminating Father's and Mother's parental rights, the trial court summarized its findings of fact and conclusions of law regarding severe child abuse as follows:

DCS proved by clear and convincing evidence that [Father and Mother] knowingly exposed C.J. and Lilly to abuse and neglect that was likely to cause either injury or death by failing to provide them adequate supervision.

They knew that even the slightest bit of inattention by a parent could cause life-long harm to the child, as both were well aware of the childhood injury that they believed stole [Father's] full mental abilities from him. Even without that knowledge, any person who watches television or pays attention to news in papers or on computer is aware that children can be kidnapped, can walk into physical danger or can harm themselves in only seconds.

Despite the knowledge that they had–or should have had–they left the children unattended for hours at a time, just because they chose to sleep late. There is no evidence that they used any method or device to keep the children safe while they slept. It is nothing short of amazing that neither child injured him/herself in the two or three hours that the parents slept while the children were awake.

The stairs in the house were only steps away from the children's bedroo[ms]. Left alone, with no parents to supervise them or play with them, the children would be likely to head down the stairs to find something to do. Small children without help are likely to fall down stairs, suffering severe injuries. Even if they had gotten down the stairs safely, they faced a number of dangers: knives in kitchen drawers that could cut them, trash on the carpet

that would choke them if they put the trash in their mouths, or the doors leading outside, to which both children were drawn.

DCS proved by clear and convincing evidence that [Father and Mother] knowingly exposed C.J. to abuse and neglect that was likely to cause either injury or death by tying him into his room.

The parents' decision to secure the child in his room did not happen only on October 14, 2010. It was a regular routine for them to tie the disabled child into his room when they did not want to supervise him. The court, based upon all of the evidence, finds that tying C.J. and Lilly in their rooms was a frequent means the parents used to keep the children contained. They knew–or should have known–that emergencies happen daily.

Had a fire broken out, it is likely that C.J. and/or [L]illy would have been left in their room to die. Tied in, neither child could have run out of the room. The parents chose their own personal comfort over seeing to and protecting both C.J. and Lilly.

It is also not unlikely that C.J.–a disturbed child without anything else to do–would have climbed out of his second-story window, falling to the ground and harming himself severely.

DCS proved by clear and convincing evidence that [Father and Mother] severely abused C.J. by ignoring his need for specialized treatment for his disabilities. The court finds that the parents and [sic] abused both children by neglecting to provide them with the most basic childhood training. Neither child could even use eating utensils or a cup.

[Father and Mother] knew that C.J. had mental and/or physical problems. They were told repeatedly–by doctors–that the child needed specialized assessment. They either ignored the doctors or made only token efforts to get the help–such as the appointments to TEAM that they did not bother to keep. Whatever the reason, both of these children were left without the help they needed and could have easily gotten if their parents had taken any action at all.

Mrs. Knowles testified that, if the child's speech impediment had been diagnosed and treated long before his placement in foster care, he could have gotten the speech therapy he needed. Mrs. Knowles testified that, the earlier a child with speech delays sees a specialist, the more progress he is likely to make. Due to lack of such early specialized treatment, he is only now learning to communicate with others. His delay may improve further over time, but it may have stalled.

[Father and Mother] failed to provide the children training to manage the most basic and/or simple human functions such as using a toilet and using eating utensils, and even to learn to drink from a cup. They failed to interact

with their children or to provide them play opportunities so that the children could interact with the world.

Neither child could speak, use the toilet or eat with utensils when removed. Soon after their placement in foster care, both were eating with utensils and both were essentially potty-trained. Lilly learned to speak well. Both learned to acknowledge words and to interact with other people. They learned to love and show emotion.

Based on the totality of the testimony, the trial court determined that the statutory ground of severe child abuse had been proven by clear and convincing evidence. We agree.

## A. Tennessee Code Annotated § 37-1-102(b)(23)(A)

Father and Mother contend that the trial court erred by finding severe child abuse pursuant to Tennessee Code Annotated § 37-1-102(b)(23)(A) because the "knowing" element required for such a finding was not established. They argue that their use of the strap to tie and secure C.J.'s door on October 14, 2010, was one isolated incident and that the proof, particularly the testimony offered by expert witnesses, demonstrated they "just did not know any better" and would have been able to care for the Children properly if provided with adequate training and supervision.

Within its conclusions of law, the trial court found that Father and Mother committed severe child abuse pursuant to both subsections (A) and (B) of Tennessee Code Annotated § 37-1-102(b)(23). Pursuant to subsection (A), the court determined that Father and Mother knowingly exposed C.J. and Lilly to abuse and neglect that was likely to cause either injury or death by routinely failing to provide the Children adequate supervision and by employing a method of containment, tying the bedroom door shut, that would trap an unattended child in an emergency.

The trial court did not find Father and Mother credible in their testimony that they had used the tying method as containment only one time or that they did so for only a few minutes. Mother's testimony regarding the day of the Children's removal was disjointed in its portrayal of times and events. She explained she awoke at 11:00 a.m., finding her alarm not working and the Children not yet out of bed. She decided to prepare bacon, lettuce, and tomato sandwiches. According to Mother, C.J. arose at 11:30 a.m., and Mr. Vasterling arrived at about noon. Mother's testimony challenged the trial court to believe that during the half-hour between 11:30 a.m. and noon, numerous events occurred, including C.J. playing in his room with his toys "for about an hour"; Mr. Burns refusing to close the outside apartment doors after numerous requests from Mother; Father finishing a shower and dressing C.J.; C.J. repeatedly removing his training pants; Mother repeatedly calling

-10-

Grandmother to bring diapers; C.J. walking downstairs five times; Mother placing C.J. back in his room and pushing the inside lock button on the bedroom door; C.J. escaping the "locked" door; Mother retrieving a baby gate from the closet and placing it in the hall between C.J.'s room and the stairs; C.J. climbing over the baby gate and coming downstairs again; Mother putting C.J. in his room and tying a "string" from one door to another; Mr. Burns refusing another request to close the back door; Mother playing with Lilly in the living room for ten minutes while waiting for the bacon to cool; and finally, Mother hearing Mr. Vasterling's knock at the door. When questioned again regarding her time line of events, Mother acknowledged that it may have been closer to 1:00 when Mr. Vasterling arrived. When questioned why she did not keep both Children with her in the kitchen, Mother indicated C.J. would not stay there.

Father testified that after he and Mother woke up on October 14, 2010, he spent an hour in the bathroom, showering and brushing his teeth, before beginning to find some pants for C.J. to wear. According to Father, there were bags of unwashed laundry in the upstairs hall, each prepared for a trip to the laundromat. He needed to go downstairs to locate pants for C.J. While he was downstairs, Father did not want C.J. to go outside, so Mother went upstairs and tied a "knitting string" from one doorknob to another to keep C.J. in his room. Father indicated that as he was preparing to go upstairs with C.J.'s pants, he answered Mr. Vasterling's knock on the door. When questioned regarding why he did not want Mr. Vasterling upstairs, Father stated he needed a moment first to move the bags of laundry in the upstairs hallway.

The trial court found Mr. Vasterling's testimony credible, including his account of Father's and Mother's attempt to prevent his observing the tied door, as well as his description of C.J.'s room as containing only an overpowering scent of urine and a broken toddler bed with no linens. According to Mr. Vasterling, the strap used to contain C.J. in the room was two to three inches wide and of the type that someone would use to tie down lumber on a vehicle. One end of the strap was woven through a knot made in a small piece of rope, which was roughly an eighth-inch in diameter. The smaller rope was in turn wrapped around the handle of the door leading to C.J.'s bedroom. The opposite end of the larger strap was tied around the knob on the door across the hall. Using a strap and rope he described as similar, Mr. Vasterling demonstrated that the rope on C.J.'s door could not have been loosened simply by pulling on the door, as C.J. might have attempted from the inside. The strap incorporated by Father and Mother was dingy in appearance, as though it had been used for some time. The court specifically found Father's claim that the strap and rope just happened to be lying around the apartment not credible.

The trial court credited Mr. Burns's testimony that while working in the parents' apartment on October 14, 2010, he kept the outside doors closed except when working in a

doorway, that he heard C.J. making noises in the back bedroom for two hours before he saw Father and Mother, that he did not see C.J. until after Mr. Vasterling arrived, and that Mother never asked him to close a door. S.B. testified that soon after the Children came to live in her home, Mother defended the parents' actions by saying she and Father had never tied C.J. in his room for "more than four hours."

Dr. Glennon and Dr. Biller both testified that if the parents tied C.J. in his room only on October 14, 2010, for a few minutes, their action was an indication of poor parental judgment. Both experts also testified, however, that if the parents exhibited a pattern of tying C.J. in his room or did so for several hours, their actions would raise much greater concern for the Children's safety. Dr. Glennon opined that the parents' attempt to remove the rope on the upstairs door before Mr. Vasterling could see it indicated the parents knew that confining C.J. in such a way was wrong.

As for Father's and Mother's failure to supervise the Children in the early mornings before the parents awoke, the trial court did not credit Mother's testimony that the entire family typically woke at approximately 10:00 a.m. Mother described feeding the Children breakfast on a typical day at about 10:30 a.m. and lunch only an hour and a half later at noon. Father testified that on occasion he and Mother cleaned the apartment until as late as 3:00 a.m., causing them to sleep late the next morning. Mr. Burns testified that C.J. had been awake and making sounds since at least 8:10 a.m. on the day the Children were taken into protective custody. Ms. Quigley maintained that each time she or maintenance personnel entered the parents' apartment for scheduled inspections or repairs, Father and Mother appeared to be just waking up, despite having notice of such appointments.

Father and Mother believed that much of Father's intellectual difficulties stemmed from a head injury he suffered as a toddler when falling from an open car window. In determining that the parents knowingly neglected the Children by routinely failing to supervise them during early mornings, the trial court noted that both parents knew through their perception of Father's childhood accident, if by no other means, how quickly an unsupervised child could encounter danger. The court found that a toddler's need to be closely supervised to avoid harm is common knowledge. We note that Father's and Mother's conflicting and often self-contradictory testimony regarding their daily routine evinced their understanding that sleeping in several hours beyond their small children's waking time would not be perceived by the court as safe parenting. The evidence preponderates in favor of the trial court's findings that Father and Mother routinely used the tied strap and rope as a method of containment and that they knew such a method could pose a danger of substantial harm to the Children. The evidence further supports the trial court's finding that Father and Mother knowingly neglected C.J. and Lilly by failing to adequately supervise them.

B. Tennessee Code Annotated § 37-1-102(b)(23)(B)

The trial court also found clear and convincing evidence of severe child abuse pursuant to Tennessee Code Annotated § 37-1-102(b)(23)(B) in that the abuse or neglect "in the opinion of qualified experts has caused or will reasonably be expected to produce . . . severe developmental delay or intellectual disability, or severe impairment of the child's ability to function adequately in the child's environment." The court determined that Father and Mother ignored C.J.'s need for specialized treatment despite their admitted knowledge that "something was wrong" with C.J. The court further determined that Father and Mother failed to teach both Children basic skills of functioning in society, such as eating with utensils and using a toilet. As the State notes, a finding of severe child abuse pursuant to subsection (B) does not require proof that the parent's exposure of the child to abuse or neglect was knowing. *See* Tenn. Code Ann. § 37-1-102(b)(23)(B); *In re Keara J.*, 376 S.W.3d 86, 101 (Tenn. Ct. App. 2012) (holding that in a proceeding for termination of parental rights, the trial court is not required to find that the parent "knowingly" neglected the child in order to support a finding of severe child abuse under subsection (B), and citing with approval *In re Samaria S.*, 347 S.W.3d 188, 205 (Tenn. Ct. App. 2011), for a parallel analysis of subsection (B) as it applies to dependency and neglect proceedings).

Medical records evinced that C.J. was seen regularly at Cleveland Pediatrics from his birth in February 2006 through late September 2006 and then twice in 2007, followed by three times in 2008. After January 2007, Mother took C.J. to the Bradley County Health Department to obtain WIC benefits and immunizations. Lilly was seen at the Health Department once in 2009 regarding WIC benefits. Both parents stated they typically accompanied the Children together to medical appointments. Bradley County Health Department Nursing Supervisor Kimberly Ann Bishop presented the Children's Health Department records, which demonstrated that C.J. was immunized as required through October 2007 but did not receive his four-year immunization until after he was taken into protective custody at four years, eight months of age. Lilly received her two-month, four-month, and six-month immunizations nearly on schedule, but she did not receive her one-year immunizations until after she was taken into protective custody at two years, eleven months of age.

Health Department records also demonstrated that on October 18, 2007, when C.J. was eighteen months old, a nutrition counselor wrote under "referable conditions" on his chart: "Child made noises during the assessment. No clear words spoken. Parents are not concerned at this time. Recommended follow up with PCP [primary care provider] if speech doesn't improve or parents get concerned." On March 31, 2008, a nutrition educator noted that she discussed with the parents a referral to "speech and hearing." On July 11, 2008, a nurse evaluated C.J. for WIC and wrote that Mother was "concerned about speech but did

-13-

not follow up with last eval. If not [showing] more progress by next visit refer to TEIS [Tennessee's Early Intervention System]." In November 2008, a nutrition educator again noted discussing a referral to a speech and hearing center with Mother.

Peggy Roberts, a bookkeeper and referral clerk for Cleveland Pediatrics, testified that although both Children had been treated there through 2008, neither had been seen at Cleveland Pediatrics between December 2008 and October 2010. Regarding C.J., six appointment dates were marked in Cleveland Pediatrics records as "no show," including March 16, 2006; April 3, 2006; May 9, 2006; October 11, 2007; August 22, 2008; and December 5, 2008. Lilly's records reflected five no-show appointment dates, all occurring between August 22, 2008, and December 5, 2008. The last appointment Father and Mother successfully kept for the Children at Cleveland Pediatrics was on December 16, 2008. The treating pediatrician on that date noted referring C.J. to Tennessee's Early Intervention System ("TEIS") due to a "speech delay." The doctor also noted C.J.'s repetitive movement and sounds, stating that Mother was "more worried about possible ADD [attention deficit disorder] than developmental delays." Mother denied at trial that any professional at Cleveland Pediatrics or the Health Department ever referred C.J. to a specialist. She claimed to have been repeatedly told that C.J. was fine. The trial court did not find Mother's testimony credible on this point.

Sonja Sparks, Finance Director for TEAM, testified that according to TEAM records, Mother called the Cleveland center on September 28, 2009, and scheduled an appointment for C.J. on November 18, 2009. She later called to cancel the appointment. Mother scheduled appointments for January 26, 2010, and March 15, 2010, but she missed both appointments without calling to cancel. Grandmother contacted TEAM on April 30, 2010, and referred C.J. because he did not respond to his name, did not speak, cried a great deal, sometimes went into a closet or corner to sleep, struggled with a speech impairment, and was not potty trained. Father and Mother never followed through with any TEAM appointment. Although the Cleveland office of TEAM closed in August 2011, DCS was successful in beginning C.J.'s assessment and treatment there in January 2011 after he was taken into protective custody.

Father and Mother both testified that their failure to keep an appointment with TEAM was due to a lack of transportation. When questioned regarding the availability of Southeast Tennessee Human Resource Agency ("SETHRA") for such appointments, Mother stated they did not use SETHRA because the agency did not allow child safety seats. Father stated SETHRA's child safety seats smelled like urine. Cleveland SETHRA Director Mary Lynn Brown testified that SETHRA requires all children between four and eight years of age and under five feet tall to ride in a child safety restraint, which must be provided by the adult

passenger accompanying the child. Ms. Brown reviewed SETHRA's call logs from 2007 through 2010 and found no calls from Father or Mother requesting services.

When questioned regarding why she made appointments at TEAM for C.J., Mother stated: "Because he was fine when he was a baby and he started to talk. And after he was one years old, he stopped talking all at once." Father also testified that C.J. was saying a few words when he was about a year old and then stopped talking completely. When asked if they had attempted to help C.J. with improving his speech at home, Mother answered that she had used flash cards so that C.J. could match words to pictures, but "nothing worked." Father described buying watercolor paints for C.J. once and helping him use the paints. Their testimony, including the fact that Mother called TEAM for assistance, evinces that Father and Mother knew C.J. was in need of specialized help, as do documented notations and referrals made by medical professionals. Mother's assertion that all of these medical professionals failed to convey their concerns to C.J.'s parents stretches credulity.

The parties stipulated that Ms. Knowles was an expert in the field of pediatric speech pathology. She first evaluated C.J. at the State's request on December 30, 2010, two months after he was taken into protective custody. She testified that she was forced to assess C.J. as though he were a baby because, though nearly five years old, he did not respond to his name and could perform very few tasks asked of him. Ms. Knowles utilized the Preschool Language Scale to measure C.J.'s auditory comprehension and expressive language skills. She determined that he was in the first percentile for auditory comprehension and expressive ability, functioning at the level of a ten-month-old child in auditory comprehension and at the level of a thirteen-month-old child in expressive ability. His noted strengths were that he was curious, sought attention by hugging the evaluator, recognized his name at times, vocalized some sounds, extended items to the evaluator, and could push and pull people to that which he desired.

Ms. Knowles treated C.J. for approximately six months, after which he showed a "good" level of accomplishment. The child began to imitate some signs, speak two spontaneous words ("go" and "more"), pay greater attention to people speaking to him, and interact in social games. Her recommendations to the foster parents for assisting C.J. at home were to model labeling items; encourage him to imitate sounds; play vocal and interactive games like peekaboo, patty-cake and simple puzzles; and read to him. At the time of trial, C.J. was continuing with speech therapy through a school program. Ms. Knowles opined he would continue to develop his skills. Although he had made clear progress, by the time she stopped treating C.J., he still was not speaking or interacting at the level typical for a child his age. Ms. Knowles stated that research supports that children make better progress the earlier they are treated through speech therapy. She also noted relying significantly on parents' or caregivers' involvement in the therapy process for optimum results.

-15-

Both S.B. and DCS case manager Milligan testified that C.J. had been diagnosed in the weeks before trial with autism, adding that they were awaiting assessment results as to his respective level within the autism spectrum. Regarding C.J.'s progress since transitioning into protective custody, S.B. testified that after eighteen months in therapy and foster care, C.J. used hand signals, responded when spoken to, followed directions, and interacted with others. She further testified that both Children had learned to use eating utensils and cups, where at the time of their removal from the parents' home, they had "not a clue" and ate only with their hands. S.B. explained that she had to teach C.J. to drink from a cup by beginning with bottles and "sippy cups." Where neither child was using a toilet at the time of removal, both Children were potty trained by the time of trial, with C.J. still experiencing a few accidents. Lilly, who S.B. described as much closer than C.J. to achieving age-level skills, was talking by the time of trial where before she had whispered nonsensically. S.B. stated that Lilly was catching up on "many things she was not exposed to or was not expected to know" in her parents' home.

As the trial court noted, Ms. Knowles, as a qualified expert, confirmed that Father's and Mother's delay in obtaining specialized treatment for C.J.'s condition prevented the child from receiving the early intervention he needed to make optimal progress toward correcting his speech delays. Four years after he stopped speaking, C.J. finally began the long process of evaluation for autism so that his challenges of interacting with people and his environment could be addressed. No expert witnesses testified as to the expected long-term effects on Lilly of her parents' failure to provide her with opportunities to learn basic skills for her age. The record supports the trial court's finding, however, that Lilly also experienced severe impairment of her ability to function adequately in her environment, including the need to spend key formative months "catching up" to other children her age.

The record also supports the trial court's finding that Father and Mother knew C.J. needed specialized care and either ignored such deficit or made only "token efforts" to address it. We note, however, that because the "knowing" element is not required for a determination of severe abuse under subsection (B) of the statutory definition, whether the parents knew their actions or inaction were causing their Children severe developmental delays and functional impairments is immaterial to this analysis. *See* Tenn. Code Ann. § 37-1-102(b)(23)(B); *In re Keara J.*, 376 S.W.3d at 101. We conclude that the evidence does not preponderate against the trial court's determination by clear and convincing evidence that Father and Mother committed severe child abuse pursuant to Tennessee Code Annotated §37-1-102(b)(23)(A) and (B). The trial court did not err by terminating Father's and Mother's parental rights based upon this ground.

IV. Dependency and Neglect Based on Severe Child Abuse

Father and Mother rely on their argument described in the previous section for their contention that the trial court erred in affirming the juvenile court's determination of dependency and neglect on the basis of severe child abuse. Noting that the definition of severe child abuse provided in Tennessee Code Annotated § 37-1-102(b)(23) applies to dependency and neglect proceedings as it does to proceedings for termination of parental rights, the State contends that the trial court properly affirmed the dependency and neglect determination based on severe child abuse. *See* Tenn. Code Ann. § 36-1-113(g)(4); Tenn. Code Ann. § 37-1-102(b)(12)(G) (providing that a child "suffering from abuse or neglect" is by definition a "dependent and neglected child"). We agree that the trial court properly affirmed the juvenile court's determination.

In its order adjudicating the Children dependent and neglected, the juvenile court found, by clear and convincing evidence, that Father and Mother had committed severe child abuse. The juvenile court stated in pertinent part:

> [U]nfortunately, what I see here are two children who are very–they're challenged. They're fighting some disabilities and some challenges they don't apparently–they're not meeting. I see a little boy that's now five years old that is still not potty trained, or wasn't potty trained in October of last year when he came into custody, and apparently the younger daughter isn't. They testified that the little boy couldn't talk, just basically communicated in grunts. The guardian ad litem in her closing argument or closing statement as to the best interest of the child listed some other challenges.
>
> It may be possible that the parents have done their best. I can't say that. I don't know. But if this is the best they can do, then it's not enough. These children are severely challenged and are going to need a lot of help.
>
> Based on the testimony that I've heard and based on the record as a whole, I find that severe abuse, which is defined under 37-1-102(21), has been proven by clear and convincing evidence. And, specifically, I would say that under 21(B) [sic],[3] where it says specific brutality, abuse or neglect towards a child that in the opinion of a qualified expert has caused or will reasonably be expected to produce–in particular, as [counsel] pointed out, I think the areas that have been proved are severe developmental delay or retardation, as exhibited by the children's lack of potty training, lack of ability to speak at their age, also inability to use table–eat with the implements and things of that

_____

[3]The juvenile court was citing the language of Tennessee Code Annotated § 37-1-102(23).

sort. Also, I think that it would qualify under severe impairment of the child's ability to function adequately in the child's environment.

In their appellate brief, Father and Mother explain that their reason for appealing only the severe abuse portion of the dependency and neglect judgment to the circuit court was that the juvenile court's severe child abuse finding was the "gateway" for DCS to retain the Children in protective custody without making reasonable efforts to reunite them with the parents. As Ms. Milligan testified and the initial permanency plan for the Children demonstrates, DCS never established reunification with the parents as a goal and declined to provide services for the parents, only suggesting steps they might take in case the juvenile court did not make a finding of severe child abuse.

Indeed, both parties correctly note that DCS was not required to make reasonable efforts toward reunification as a direct result of the juvenile court's ruling. *See* Tenn. Code Ann. § 37-1-166(g)(4)(A) (2010) (stating that under "aggravated circumstances" as defined in section 36-1-102, DCS is not required to make reasonable efforts toward reunification); Tenn. Code Ann. § 36-1-102(9) (2010) (including severe child abuse in the applicable definition of "aggravated circumstances"); *In re Tiffany B.*, 228 S.W.3d 148, 157 n.15 (Tenn. Ct. App. 2007) (citing the foregoing statutes in noting that the Tennessee General Assembly has recognized that "some parents' conduct is so inimical to their children's well-being that the family relationship either cannot or should not be repaired or restored"); *In re C.M.M. & S.D.M.*, No. M2003-01122-COA-R3-PT, 2004 WL 438326 at *6 n.19 (Tenn. Ct. App. Mar. 9, 2004) (noting that severe child abuse is one of the aggravated circumstances in which DCS is not required to make reasonable efforts to reunite parents and children). Father and Mother also argue that there was no threat of substantial harm to the Children sufficient to warrant their removal from the parents' home. This threat was established by the juvenile court's finding of severe child abuse. *See id.*; *see, e.g., Dep't of Children's Servs. v. L.S.*, No. M1999-00847-COA-R3-CV, 2000 WL 1425234 at *2-3 (Tenn. Ct. App. 2000).

Father and Mother argue that the juvenile court failed to find the "knowing" element required for a severe child abuse finding under Tennessee Code Annotated § 37-1-102(b)(23)(A), noting particularly the court's statement that the parents may have "done their best." We note, however, that the juvenile court found severe child abuse pursuant specifically to Tennessee Code Annotated § 37-1-102(b)(23)(B), which, as established above, does not require that the parents *knowingly* caused the Children's developmental delays and functional impairments. *See In re Keara J.*, 376 S.W.3d at 101. Having determined that the trial court did not err in terminating Father's and Mother's parental rights based on the ground of severe child abuse, we also conclude that the trial court did not err in affirming the juvenile court's finding of severe child abuse as a ground for adjudicating the Children dependent and neglected.

## V. Mental Incompetence

The second statutory ground upon which the trial court terminated Father's and Mother's parental rights was the finding that they were mentally incompetent to parent the Children. The parents contend and the State concedes that the evidence does not support a finding of mental incompetence to parent. We agree.

Tennessee Code Annotated § 36-1-113(g)(8) provides:

(g) Initiation of termination of parental or guardianship rights may be based upon any of the grounds listed in this subsection (g). The following grounds are cumulative and non-exclusive, so that listing conditions, acts or omissions in one ground does not prevent them from coming within another ground:

* * *

(8)(A) The chancery and circuit courts shall have jurisdiction in an adoption proceeding, and the chancery, circuit, and juvenile courts shall have jurisdiction in a separate, independent proceeding conducted prior to an adoption proceeding to determine if the parent or guardian is mentally incompetent to provide for the further care and supervision of the child, and to terminate that parent's or guardian's rights to the child;

(B) The court may terminate the parental or guardianship rights of that person if it determines on the basis of clear and convincing evidence that:

(i) The parent or guardian of the child is incompetent to adequately provide for the further care and supervision of the child because the parent's or guardian's mental condition is presently so impaired and is so likely to remain so that it is unlikely that the parent or guardian will be able to assume or resume the care of and responsibility for the child in the near future; and

(ii) That termination of parental or guardian rights is in the best interest of the child;

-19-

(C) In the circumstances described under subdivisions (8)(A) and (B), no willfulness in the failure of the parent or guardian to establish the parent's or guardian's ability to care for the child need be shown to establish that the parental or guardianship rights should be terminated . . . .

*See also State, Dep't of Human Servs. v. Smith*, 785 S.W.2d 336, 338-39 (Tenn. 1990) (holding that a parent's mental disability may be a ground for termination of parental rights when such termination is in the child's best interest even when the mentally disabled parent's actions are not willful).

In its order terminating Father's and Mother's parental rights, the trial court summarized its findings of fact and conclusions of law regarding mental incompetence as follows:

DCS proved by clear and convincing evidence that [Father and Mother] are mentally incompetent to provide for the further care and supervision of the children because their mental conditions are so impaired and so likely to remain impaired that it is unlikely that he [sic] will be able to assume or resume the care of and responsibility for the child[ren] in the near future.

Both parents have mental health needs that will require long-term parenting training and therapy to overcome. They are either mentally retarded or have significant intellectual handicaps. Their understanding of reality–such as considering their home clean when it was filthy and considering it appropriate to tie a child in his room–is both inappropriate and unacceptable.

[Mother] was diagnosed with PTSD, a disorder that can cripple her ability to meet–or even notice–her children's needs. [Father] is schizotypal, a disorder that can make it difficult for him to involve himself in his children's lives. He likely has brain injuries or disabilities that have never been treated.

Their parenting weaknesses are unlikely to be rectified soon if at all. The doctors who evaluated [Father and Mother] recommended a long term program of parenting training–including training that was controlling rather than supportive. After that training, [Father and Mother] would need consistent if not constant intervention by an effective support system.

[Father's and Mother's] mental and emotional problems–and their resulting inability to parent–is unlikely to be corrected at all. DCS does not have the type of parental training that the doctors have prescribed. [Father and Mother] do not have the support system they need, nor does this type of support system appear to exist.

At this point, any further delay in finding permanency for C.J. and Lilly is too long and potentially devastating to C.J. and Lilly. It has been almost two years since the children were placed in foster care. [Father and Mother] have done little on their own to make their home a safe place for the children–[Mother] thought that she and [Father] only needed to get rid of the strap that they used to tie C.J. in his room to regain custody of the children. They have not gotten the mental health treatment recommended to them by DCS. The parenting class they attended did not address the care and nurture of special needs children.

Dr. Glennon assessed both parents' intelligence levels using, among other assessment tools, the Wide Range Intelligence Test ("WRIT"). He found that Father functioned at a "mildly mentally retarded level." He also diagnosed Father as schizotypal, which Dr. Glennon explained as a personality disorder in which Father adapts to the world by acting so strangely that people leave him alone. Dr. Glennon's test results indicated that Father "understands what's going on, he's able to perceive and organize it, but he doesn't always incorporate it into what he's known before as well." He found that Father's mind functioned in such a way that he became absorbed in details and experienced difficulty comprehending the "big picture."

Dr. Glennon also assessed Mother's intelligence as at a "mildly mentally retarded" level. He diagnosed Mother as suffering from post-traumatic stress disorder ("PTSD") due to abuse she suffered in childhood. He found that Mother had difficulty viewing herself the way other people saw her because she had "a rigid tendency" toward self-confidence and self-deception. Dr. Glennon explicitly stated that Mother was not mentally incompetent, adding that parenting is, however, "very difficult" for her. Dr. Glennon assessed both parents as struggling with "narrative competency," in that their emotions interfered with their ability to tell a story logically. He further determined that both Father and Mother were fearful of making mistakes to the point of experiencing difficulty making decisions. He opined that Father and Mother "could function very well together if there was somebody who had directional authority," but they would need intensive, daily supervision for some time to help them learn how to competently parent and maintain a household.

Dr. Biller assessed Father's intelligence level using, among other assessment tools, the Wechsler Abbreviated Scale of Intelligence ("WASI"), finding that Father functioned at the lowest limits of the low average range. Other tests of Father's mental status revealed that he was oriented to reality and not misinterpreting the world. Dr. Biller acknowledged that his findings represented an optimal result for Father because as the evaluator, Dr. Biller encouraged Father to continue answering questions when it appeared as though Father might give up. He found that Father demonstrated a tendency not to challenge himself.

Dr. Biller assessed Mother's intelligence level using, among other assessment tools, the WASI and also the Wide Range Achievement Test because Mother was more academically competent than Father. He assessed Mother's intelligence to be in the average to low average range. Mother could read at a ninth-grade level and could perform mathematics at a third-grade level. Dr. Biller did not diagnose Mother with PTSD, as Dr. Glennon had, but he diagnosed her with an adjustment disorder with moderate depressed mood in reaction to her environment. Dr. Biller found the parents' relationship with each other to be good but not sufficient to help each other learn competent parenting skills. He opined that they would need intervention indefinitely with many opportunities to practice newly learned skills in order to parent effectively.

In finding Father and Mother mentally incompetent to provide for the further care and supervision of the Children, the trial court described their intellectual and emotional difficulties, finding that they were highly unlikely to obtain the type of intensive intervention recommended by both expert witnesses. In contrast, this Court, in affirming a finding of mental incompetence, has noted an expert witness's assessment of a father's ability to function "in such a low range that no amount of training, education, or counseling" would facilitate his parenting the children. *In the Matter of N.B., C.B., & T.B.*, 285 S.W.3d 435, 449 (Tenn. Ct. App. 2008); *see also State, Dep't of Children's Servs. v. Whaley*, No. E2001-00765-COA-R3-CV, 2002 WL 1116430 at *14 (Tenn. Ct. App. May 30, 2002) (reversing the trial court's termination of parental rights of a mildly intellectually disabled mother based on her mental incompetence where the mother had successfully obtained vocational training, maintained employment, utilized public transportation, maintained a household, and secured a competent support system).

In the case at bar, both psychologists opined that Father and Mother could learn to competently parent with intensive, long-term intervention. Indeed, our previous conclusion that Father and Mother knowingly failed to supervise the Children and used an unsafe method of restraint is based in part on both parents' ability to comprehend that their practices did not constitute safe or appropriate parenting. We conclude that the evidence does not support the trial court's finding that Father and Mother were mentally incompetent to provide for the further care and supervision of the Children. The trial court erred by terminating Father's and Mother's parental rights based upon this ground.

## VI. Best Interest of Children

When parents have been found to be unfit by establishment of a statutory ground for termination, as here by the ground of severe child abuse, the interests of parents and children diverge, and the focus shifts to what is in the children's best interest. *In re Audrey S.*, 182 S.W.3d at 877. Tennessee Code Annotated § 36-1-113(i) (2010) provides a list of factors

the trial court is to consider when determining if termination of parental rights is in a child's best interest. This list is not exhaustive, and the statute does not require the court to find the existence of every factor before concluding that termination is in a child's best interest. *In re Audrey S.*, 182 S.W.3d at 878. Further, the best interest of a child must be determined from the child's perspective and not the parent's. *White v. Moody*, 171 S.W.3d 187, 194 (Tenn. Ct. App. 2004).

Tennessee Code Annotated § 36-1-113(i) lists the following factors for consideration:

(1) Whether the parent or guardian has made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the child's best interest to be in the home of the parent or guardian;

(2) Whether the parent or guardian has failed to effect a lasting adjustment after reasonable efforts by available social services agencies for such duration of time that lasting adjustment does not reasonably appear possible;

(3) Whether the parent or guardian has maintained regular visitation or other contact with the child;

(4) Whether a meaningful relationship has otherwise been established between the parent or guardian and the child;

(5) The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological and medical condition;

(6) Whether the parent or guardian, or other person residing with the parent or guardian, has shown brutality, physical, sexual, emotional or psychological abuse, or neglect toward the child, or another child or adult in the family or household;

(7) Whether the physical environment of the parent's or guardian's home is healthy and safe, whether there is criminal activity in the home, or whether there is such use of alcohol or

controlled substances[4] as may render the parent or guardian consistently unable to care for the child in a safe and stable manner;

(8) Whether the parent's or guardian's mental and/or emotional status would be detrimental to the child or prevent the parent or guardian from effectively providing safe and stable care and supervision for the child; or

(9) Whether the parent or guardian has paid child support consistent with the child support guidelines promulgated by the department pursuant to § 36-5-101.

In determining that termination of Father's and Mother's parental rights was in the best interest of the Children, the trial court stated:

Here, DCS proved by clear and convincing evidence that termination of [Father's and Mother's] parental rights is in the children's best interests.

[Father and Mother] have not made changes in their home or their parenting abilities that would make it safe for the children to go home.

They have severely abused and seriously neglected the children and, due to the cancellation of their visitation due to that severe abuse, they no longer have any meaningful relationship with the children. At this point, these young children are highly unlikely to remember their parents.

The parents' mental/emotional states prevent them from effectively parenting the children.

Changing caregivers at this stage of the children's lives would have detrimental effects on them–both have blossomed in their foster home, and both need the nurture and specialized care provided to them there. The children have established a strong bond with their foster parents, who want to adopt them.

The trial court therefore concluded that it was in the Children's best interest to terminate Father's and Mother's parental rights. Upon our careful review of the entire record, we agree.

---

[4]Effective July 2012, after the filing of the petition in the instant case, The Tennessee General Assembly amended Tennessee Code Annotated § 36-1-113(i)(7) to substitute "alcohol, controlled substances or controlled substance analogues" in place of "alcohol and controlled substances." *See* 2012 Pub. Acts ch. 848, § 8.

In analyzing the factors contained in Tennessee Code Annotated § 36-1-113(i), the trial court emphasized the following factors as weighing heavily against maintaining Father's and Mother's parental rights: (1) failure to adjust circumstances, conduct, or conditions for safety and the Children's best interest; (4) lack of meaningful relationship with the Children; (5) negative effect a change of caretakers and physical environment would likely have on the Children's emotional, psychological, and medical condition; (6) parents' severe abuse toward the Children; (7) unhealthy and unsafe physical condition of home; and (8) parents' mental and emotional status as preventing them from providing safe and stable care and supervision of the Children.

Father and Mother contend that they have made what adjustments they could to facilitate the safe return of the Children to their home. The parents specifically assert that they would not repeat the "isolated incident" of tying C.J.'s bedroom door shut. They have established a new residence and employment. At the time of trial, Father and Mother, having been evicted from the apartment complex where they lived with the Children, were renting a home in Chattanooga. Mother was employed as a "home sitter" for an elderly woman, and Father sometimes assisted her in this employment. The parents argue that DCS wrongfully withheld services that would have enabled them to parent competently. Father and Mother therefore assert that the following statutory factors should not weigh against the Children's return to them: (1) adjustment of circumstances, conduct, or conditions and (2) failure to effect a lasting adjustment after reasonable efforts by available social services agencies. *See* Tenn. Code Ann. § 36-1-113(i). The parents' argument is unavailing in light of our previous conclusions that the trial court did not did not err in finding a pattern of conduct that constituted severe child abuse and that DCS was not required to provide services toward reunification once the juvenile court adjudicated the Children dependent and neglected based on severe child abuse. *See In re Tiffany B.*, 228 S.W.3d at 157 n.15.

Father and Mother also dispute the trial court's finding regarding statutory factor (5), a negative effect on the Children of a change in caretakers. *See* Tenn. Code Ann. § 36-1-113(i)(5). The parents reference testimony offered by Dr. Glennon in which he generally believed "real parents" to be the best choice when "necessary services and necessary interventions" could be provided. Dr. Glennon and Dr. Biller both opined that Father and Mother could learn to parent competently if they were intensely supervised for several hours a day, at least initially, by a professional whose authority the parents recognized, coupled with additional support provided by competent, as yet unidentified, family members. The trial court considered this testimony but found that such intensive services and competent support were not available at the level necessary to ensure the Children's safety if they were returned to Father and Mother.

In addition, testimony established that at the time the Children came into protective custody, Father's and Mother's relationship with C.J. in particular was problematic. DCS allowed Father and Mother supervised visitation with the Children until the juvenile court reached its severe child abuse finding in December 2010. Janice Flowers, a DCS community services assistant who supervised the visits, testified that Father and Mother essentially ignored C.J. during visitation, paying attention only to Lilly. Ms. Flowers stated that C.J. put items in his mouth "like a toddler," and neither parent made any effort to correct his behavior. Ms. Milligan testified that during the time the Children were in protective custody, they both needed surgical procedures to have tubes placed in their ears. She stated that Father and Mother called to ask about Lilly's status after surgery but neglected to inquire about C.J.

The Children's foster mother, S.B., testified that when C.J. came into her home, he "seemed almost like he didn't know how to have emotions." As she described C.J.'s considerable progress in developing communication and living skills, outlined in earlier sections of this opinion, S.B. stated the following in answer to a question about her relationship with C.J.:

> Oh, well, he's mommy-me shadow. If I'm sitting here, he's going to sit as close to me as he can. When I come in from work, he runs to hug me and smell me. He likes to sniff me, I'm not sure why, but every day he runs to me and hugs me and smells me. We hug all through the day. He is honestly one of the most loving people and he loves everybody.

As noted earlier, S.B. also testified regarding Lilly's progress since entering protective custody, explaining that Lilly had learned to speak at a level commensurate with her age, use a cup and eating utensils, and become fully potty trained. The record evinced that the foster parents had been highly conscientious in obtaining necessary speech therapy for C.J. and evaluation for Lilly, as well as other needed medical treatment, socialization, and schooling. Father's and Mother's argument regarding this factor is unavailing.

We conclude that the evidence does not preponderate against the trial court's determination, by clear and convincing evidence, that terminating Father's and Mother's parental rights was in the best interest of the Children.

## VII. Conclusion

The decision of the trial court is affirmed in part and reversed in part. Costs on appeal are assessed equally to the appellants, Christopher S. and Tawana S., and the appellee, the State of Tennessee, Department of Children's Services. This case is remanded to the trial

court, pursuant to applicable law, for enforcement of the trial court's judgment terminating the appellants' parental rights and collection of costs assessed below.

_____
THOMAS R. FRIERSON, II, JUDGE